# EXHIBIT A

## CONTRACT OF PURCHASE AND SALE

THIS CONTRACT OF PURCHASE AND SALE (this "**Contract**") is made and entered into as of the Effective Date (as defined in Section 13.8 hereof) by and between CJ Automotive Indiana, LLC, an Indiana limited liability company ("**Seller**") and Butler Propco LLC, a Delaware limited liability company, or assigns ("**Purchaser**").

## ARTICLE I.

## SALE OF THE PROPERTY

1.1    Subject Property.  For the consideration and upon and subject to the terms, provisions and conditions of this Contract, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the following:

(a)    those certain parcels of real property known and numbered as 100 Commerce Street, W. Main Street and W. Oaks Street in Butler, Indiana and as more fully described on Exhibit A attached hereto together with all easements, air, mineral and riparian and development rights and all rights, privileges, servitudes and appurtenances thereunto belonging or appertaining, including all right, title and interest in and to the streets, alleys and rights-of-way adjacent to the Land and any rights of use, servitudes, licenses, permits, tenements, hereditaments, privileges and appurtenances belonging or in any way pertaining to such real property and the Improvements (collectively the "**Land**");

(b)    all building structures, improvements and fixtures, including heating, lighting, plumbing, electrical and air-conditioning equipment, located on the Land improvements (the "**Improvements**") and appurtenances (the "**Appurtenances**") located on or pertaining to the Land;

(c)    all of the personalty, equipment, inventory, supplies and personal property located on, and used for the operation of, the Land, and not used in, or for the operation of, the Seller's business thereon, including, without limitation, any landscaping equipment and all heating, lighting, plumbing, electrical and air-conditioning fixtures and equipment, situated in or about the Land, used in the operation of the Land (the "**Personal Property**"); by way of clarification, Personal Property does not include Seller's trade fixtures, business equipment, parts, work-in-process, raw materials, inventory and supplies, or any of Seller's furniture, computers and office equipment or supplies;

(d)    all service and maintenance contracts related to the Land listed on Exhibit B and agreed to be assumed by the Purchaser during the Investigation Period (the "**Contracts**");

(e)    all, licenses, permits, certificates of occupancy and franchises for the Land or Improvements (the "**Permits**");

(f)    all unexpired warranties relating to the Land and the Improvements (the "**Warranties**"); and

(g)     all plans and specifications relating to the construction of the Improvements (the **"Plans"**).

The Land, Improvements, Appurtenances, Personal Property, Contracts, Permits, Warranties and Plans are collectively referred to herein as the **"Property"**.

## ARTICLE II.

### PURCHASE PRICE

2.1     Purchase Price.  The total Purchase Price (herein so called) to be paid by Purchaser to Seller for the Property is the sum of Four Million Two Hundred Thousand Dollars ($4,200,000.00) (the **"Purchase Price"**) plus or minus prorations.

## ARTICLE III.

### EARNEST MONEY DEPOSIT

3.1     Earnest Money Deposit.  Within three Business Days after the Effective Date, Purchaser shall deliver to Amrock Title LLC, located at 201 West Big Beaver Road, Suite 160, Troy, Michigan, 48084-4169 Attention: Robert Powell (the **"Title Company"** or **"Escrow Agent"**), an amount equal to One Hundred Fifty Thousand Dollars ($150,000.00) (this, and any additional amounts, as provided herein, the **"Earnest Money Deposit"**) in Current Funds, to be held by the Title Company in escrow to be applied or disposed of by the Title Company as is provided in this Contract. Provided that Purchaser has not terminated this Contract pursuant to the terms hereof, on the business day immediately following the Inspection Period, Purchaser shall deliver an additional Fifty Thousand Dollars ($50,000.00) in Current Funds to Title Company, for a total of Two Hundred Thousand Dollars ($200,000.00) in Earnest Money Deposit to be held by the Title Company in escrow to be applied or disposed of by the Title Company as is provided in this Contract. As used in this Contract, the term **"Current Funds"** shall mean wire transfers, certified funds or a cashier's check in a form acceptable to the Title Company that would permit the Title Company to immediately disburse such funds.

3.2     Application and Interest.  If the purchase and sale hereunder is consummated, then the Earnest Money Deposit shall be applied to the Purchase Price at Closing to reduce the amount required under Section 8.2(b)(i) hereof.  In all other events, the Earnest Money Deposit shall be disposed of by the Title Company as provided in this Contract.  If agreed to by the parties, the Title Company shall invest the Earnest Money Deposit in a federally insured interest-bearing account for the benefit of Purchaser at a bank deemed appropriate by the Title Company. All interest earned on the Earnest Money Deposit is part of the Earnest Money Deposit, to be applied or disposed of in the same manner as the Earnest Money Deposit under this Contract.

3.3     Demand for Earnest Money Deposit.  Except for a termination of this Contract by Purchaser during the Inspection Period (with respect to which the provisions of Section 5.2 apply) or as permitted under this Contract, if for any reason the Closing does not occur and either party makes a written demand upon the Title Company for payment of the Earnest Money Deposit, the Title Company shall give written notice to the other party of such demand.  If the

Title Company does not receive a written objection from the other party to the proposed payment within five (5) business days after the giving of such notice, the Title Company is hereby authorized to make such payment. If the Title Company does receive such written objection within such five (5) business day period or if for any other reason the Title Company in good faith shall elect not to make such payment, the Title Company shall continue to hold such amount until otherwise directed by written instructions from both parties to this Contract or a final judgment of a court of competent jurisdiction which is not subject to further appeal. The parties acknowledge that the Title Company is acting solely as a stakeholder at their request and for their convenience, that the Title Company shall not be deemed to be the agent of either of the parties, except as expressly set forth herein, and that the Title Company shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Contract or of any escrow agreement or involving gross negligence. The Title Company joins in the execution of this Contract solely for the purpose of acknowledging receipt of the Earnest Money Deposit and its agreement to hold the same pursuant to the terms hereof.

## ARTICLE IV.

## TITLE AND SURVEY

4.1     <u>Title</u>.  Seller shall deliver (or cause the Title Company to deliver) to Purchaser copies of the following that are in Seller's current possession or control: (a) any lender's or owner's policies of title insurance or commitments, whether in the name of Seller or their predecessors in interest (the "**Title Policy**") for the Property, and (b) instruments, documents or agreements referenced in the Title Policy (the "**Exception Documents**"), and (c) any surveys of the Property (the "**Existing Surveys**").  Purchaser may order an update of the Existing Surveys ("**Updated Survey**") and a Commitment of the Title Company to issue an Owner's Title Policy (referred to hereinafter as the "**Title Commitment**") for the Property, naming Purchaser as the named insured in the amount of the Purchase Price.  Purchaser shall have until the end of the later of: (i) ten (10) Business Days after receipt of the Title Commitment and Updated Survey; and (ii) the Inspection Period to review and approve or disapprove the Title Policy, Title Commitment, Exception Documents and the Updated Survey.  If Purchaser has any objections to the matters set forth in the Title Commitment, Title Policy, Exception Documents or the Updated Survey, Purchaser shall notify Seller in writing ("**Title Objection Notice**").  Within five (5) days after receipt of the Title Objection Notice Seller shall notify Purchaser whether or not Seller shall, at its option, resolve any such objections; provided, that if Seller indicates it will not resolve any objection, Seller shall have no obligation to cure any such objection.  If Purchaser fails to provide Seller written objections pursuant to its rights by the date specified in this Section 4.1, then Purchaser shall be deemed to have acknowledged to Seller that Purchaser has no objections to the matters set forth in the Title Policy, the Title Commitment, the Exception Documents or the Updated Survey, and will accept title to the Property in the form described in Section 4.2 hereof.  If Purchaser provides Seller with written objections to the Title Policy, the Title Commitment, Exception Documents or Updated Survey on or before the date specified above, and Seller does not agree, in writing, delivered to Purchaser within ten (10) business days of the Title Objection Notice, or if, upon agreement to cure Seller fails to do so on or before Closing, Purchaser may terminate this Contract by providing written notice to Seller by the later of (i) ten (10) days after receipt of Seller's notice or the expiration of the Inspection Period, in

which event neither party shall have any further rights, duties or obligations hereunder (except with respect to provisions of this Contract which expressly survive the termination of this Contract) and the Earnest Money Deposit shall be returned and delivered to Purchaser. If Purchaser does not terminate this Contract pursuant to its rights under this Section 4.1 or under Section 5.2 on or before the end of the Inspection Period, then Purchaser shall be deemed to have acknowledged to Seller that Purchaser will accept title to the Property in accordance with the provisions of Section 4.2 below. Notwithstanding the foregoing, Purchaser shall not be required to object to and Seller will in all events pay off any monetary liens against the Property, which may be paid from the proceeds payable to Seller at Closing and Seller shall provide such affidavits and documentation required by the Title Company to delete the "standard exceptions" to title. Notwithstanding anything to the contrary herein, Seller makes no representations to Purchaser that the Title Company may delete "standard exceptions".

4.2     Status of Title at Closing. It shall be a condition to Purchaser's obligations hereunder that at Closing title to the Property shall be subject to only the following exceptions, as applicable ("**Permitted Exceptions**"):

(a)     Building, zoning and subdivision laws and ordinances, and local, state and federal laws, rules and regulations;

(b)     The exceptions to title listed in the Title Commitment and the Exception Documents, except those Seller has agreed in this Contract or in writing, as provided in Section 4.1 above, to cure prior to Closing;

(c)     Any title exceptions arising out of the acts of Purchaser;

(d)     Any and all easements, rights-of-way, buildings, improvements and other matters shown on the Existing Surveys except those Seller has agreed in this Contract or in writing, as provided in Section 4.1 above, to cure prior to Closing; and

(f)     Taxes and assessments encumbering the Property not yet due or payable.

## ARTICLE V.

## INSPECTION BY PURCHASER

5.1     Inspection Rights. Purchaser shall have a period of time commencing on the Effective Date and expiring at 5:00 p.m., Eastern Daylight Time, on the thirtieth (30th) day following the Effective Date (the "**Inspection Period**"), and thereafter until Closing or earlier termination of this Contract, within which to examine the Title Policy, Title Commitment, Exception Documents, Existing Surveys, Submission Matters (as defined below), other documents and other items and the Property (collectively, the "Due Diligence Items") and conduct its feasibility study thereof. Seller must deliver the Due Diligence Items or provide access to same on the Effective Date or promptly thereafter. Notwithstanding the foregoing, (a) Purchaser shall not permit any construction, mechanic's or materialman's liens or any other liens to attach to the Property or any portion thereof by reason of the performance of any work or the purchase of any materials by Purchaser or any other party in connection with any studies or tests conducted pursuant to this Section 5.1; and (b) Purchaser shall give not less than one (1) business

days notice (which may be by telephone or email) to Seller prior to entry onto the Property and shall permit Seller to have a representative present during all investigations and inspections conducted with respect to the Property; provided however, if Seller's inspector is unavailable the inspection shall proceed without them. Purchaser shall indemnify, defend and hold Seller harmless for, from and against any and all claims, liabilities, causes of action, actual, out-of-pocket damages, liens, losses and expenses (including, without limitation, reasonable attorneys' fees and costs) resulting from any of Purchaser's or its agents', contractors' or representatives' activities on the Property or from Purchaser's breach of its obligations or agreements under this Article V. Purchaser's indemnity obligations contained in this Section 5.1 shall survive the Closing and not be merged therein and shall also survive any termination of this Contract; provided however, in no event shall Purchaser be liable to the extent of the negligence of Seller, its employees, agents or contractors.

5.2 _Approval of Inspections._ If Purchaser determines at any time prior to the expiration of the Inspection Period that the Property is not satisfactory to Purchaser for any reason or for no reason whatsoever in Purchaser's sole and absolute discretion, then Purchaser may terminate this Contract by delivering written notice of termination to Seller prior to the end of such Inspection Period. If Purchaser properly terminates this Contract pursuant to this Section 5.2, then this Contract shall be terminated, the Title Company shall return the Earnest Money Deposit to Purchaser upon the unilateral direction of Purchaser and notwithstanding any contrary direction from Seller, and neither party shall have any further rights, duties or obligations hereunder except with respect to the provisions of this Contract which expressly survive the termination of this Contract. If Purchaser does not timely deliver to Seller written notice of termination during the Inspection Period, the conditions of this Section 5.2 shall not be deemed satisfied, and Purchaser shall be deemed to terminate this Contract pursuant to this Section 5.2.

5.3 _Matters Delivered by Seller._ Within five (5) business days after the Effective Date, and each day that Seller does not deliver such Submission Materials shall extend the Inspection Period on a day by day basis, Seller shall deliver to Purchaser copies of the documents on Schedule 5.3 to this Contract (collectively, the **"Submission Matters"**), to the extent they exist and are in Seller's possession or control.

## ARTICLE VI.

## REPRESENTATIONS AND WARRANTIES; DISCLAIMERS AND WAIVERS

6.1 _Representations and Warranties of Purchaser._ Purchaser represents and warrants to Seller as of the Effective Date and as of the Closing Date, as applicable, that (a) Purchaser is a limited liability company, duly organized and validly existing under the laws of the State of Delaware; (b) the Property is being acquired by Purchaser for investment purposes only, for its own account, and not with a view to distributing, reselling, pledging, or otherwise disposing of the Property; (c) this Contract constitutes a valid and legally binding obligation of Purchaser, enforceable in accordance with its terms; (d) as of the Closing Date, Purchaser has had an opportunity to ask the representatives of Seller any and all questions it has about the Property; and (d) Purchaser has the requisite knowledge and experience in real estate, finance, and investments generally so that Purchaser is able to evaluate the merits and risks of the investment in the Property.

6.2    <u>Representations and Warranties of Seller</u>.  Seller hereby represents and warrants to Purchaser as of the Effective Date and as of the Closing Date as applicable:

(a)    Seller is a duly organized and validly existing limited liability company under the laws of the State of Indiana.

(b)    Seller has the full right, power and authority to sell and convey the Property to Purchaser as provided in this Contract and to carry out Seller's respective obligations hereunder.  All requisite action necessary to authorize Seller to enter into this Contract and perform their obligations hereunder has been taken.  The joinder of no person or entity other than Seller will be necessary to convey the Property fully and completely to Purchaser upon Closing.  This Contract is a valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms.  The individual executing this Contract on Seller's behalf has been duly authorized and empowered to bind Seller to this Contract;

(c)    This Contract constitutes a valid and legally binding obligation of Seller, enforceable in accordance with its terms;

(d)    The Submission Matters furnished by Seller to Purchaser are true, complete and correct copies of the documents they purport to represent;

(e)    Except as otherwise shown in the Submission Matters and the Permitted Exceptions, Seller has not received written notice that any condemnation proceedings, eminent domain proceedings or similar actions or proceedings are now pending or, to Seller's actual knowledge, threatened against the Property;

(f)    Seller is not insolvent and is able to pay its debts as they mature and no proceeding in bankruptcy or for the appointment of any receiver for all or any portion of Seller's property, real or personal, has been filed by or against Seller in any federal or state court and there are no federal or state tax liens against Seller or the Property;

(h)    There is no litigation pending or, to the best of Seller's knowledge, threatened against Seller or the Property;

(i)    the execution of this Contract and the consummation of the transaction contemplated herein do not and will not violate the terms of any agreement or court order which is binding upon Seller or Property.

(j)    Seller has received no notice that the Property or Seller are in violation of any of the applicable requirements of law in connection with the disposal, storage, treatment, generation, processing and other handling of waste and the emission or discharge of any effluent, contaminants, pollution or other materials, and no other person or entity has used all or part of the Property or any lands contiguous to the Property in violation of any of those requirements of law.

(l)     Except as disclosed to Purchaser, to the best of Seller's knowledge, there are no management, employment, service, equipment, supply, maintenance, water, sewer, or other utility or concession agreements or agreements with municipalities (including improvement or development escrows or bonds) with respect to or affecting the Property which will burden the Property or Purchaser after Closing in any manner whatsoever, except for instruments of record.

(m)     No party has any right or option to acquire or lease the Property or any portion thereof.

(o)     If, during the period between the Effective Date and the Closing Date or earlier termination hereof, any event occurs or condition exists which renders any of the representations contained herein untrue or misleading in any material respect, Seller shall promptly (within the earlier of the expiration of the Inspection Period or three (3) days) notify Purchaser.

(p)     From the date hereof through Closing, Seller shall operate the Property in accordance with the prudent and customary management practices for properties of this type and in compliance with the provisions of this Agreement. Seller will maintain, or will cause Tenant to maintain, in effect through Closing the insurance presently maintained on the Property.

(q)     Seller has no knowledge of any violations nor has Seller received notices of violations affecting the Property (including without limitation, violations or notices of violations with respect to the Americans With Disabilities Act or any lead paint regulations) and Seller has not received any notification from any governmental agency requiring any repairs, replacements or alterations to the Property.

(r)     The Seller is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate" as those terms are defined in Section 1445 of the Internal Revenue Code.

(s)     There is no assessment presently outstanding or unpaid for local improvements or otherwise which has or may become a lien against any Property. Further, Seller knows of no public improvements which have been ordered to be made and/or which have not heretofore been completed, assessed and paid for.

(t)     In the event any claim is made by any party for the payment of any amount due for the furnishing of labor and/or materials to the Property or the Seller prior to Closing, or in the event any lien is filed against the Property subsequent to Closing as a result of the furnishing of such materials and/or labor prior to Closing, Seller shall immediately pay said claim and discharge said lien.

(u)     Neither Seller nor any of its constituent partners, members or shareholders have engaged in any dealings or transactions, directly or indirectly, (a) in contravention of any U.S., international or other money laundering regulations or conventions,

including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S.C. § 1 et seq., as amended), or any foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, or (b) in contravention of Executive Order No. 13224 dated September 24, 2001 issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), as may be amended or supplemented from time to time ("Anti-Terrorism Order") or on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization of Economic Cooperation and Development, Financial Action Task Force, U.S. Office of Foreign Assets Control, U.S. Securities & Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, or any country or organization, all as may be amended from time to time. Neither Seller nor any of its constituent partners, members or shareholders (i) are or will be conducting any business or engaging in any transaction with any person appearing on the U.S. Treasury Department's Office of Foreign Assets Control list of restrictions and prohibited persons, or (ii) are a person described in section 1 of the Anti-Terrorism Order, and to the best of Seller's knowledge, neither Seller nor any of its affiliates have engaged in any dealings or transactions, or otherwise been associated with any such person. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

6.3   NO ADDITIONAL REPRESENTATIONS OR WARRANTIES OF SELLER. PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SPECIFIED IN THIS CONTRACT OR IN THE CLOSING DOCUMENTS, SELLER HAS NOT MADE, AND SELLER HEREBY SPECIFICALLY DISCLAIMS, ANY REPRESENTATION OR WARRANTY OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, OR ANY OTHER MATTER OR THING REGARDING THE LAND OR IMPROVEMENTS. PURCHASER AGREES TO ACCEPT THE PROPERTY AND ACKNOWLEDGES THAT THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE BY SELLER ON AN "AS IS, WHERE IS, AND WITH ALL FAULTS" BASIS. PURCHASER IS AN EXPERIENCED PURCHASER OF PROPERTIES SUCH AS THE PROPERTY AND PURCHASER HAS MADE OR WILL MAKE PURCHASER'S OWN INDEPENDENT INVESTIGATION OF THE PROPERTY. THE PROVISIONS OF THIS SECTION 6.3 SHALL SURVIVE THE CLOSING HEREUNDER.

6.4   Survival of Representations and Warranties. The representations and warranties of Seller and Purchaser set forth in this Article VI shall survive the Closing for a period of

eighteen (18) months subsequent to Closing, and any action brought upon a claim by Purchaser or Seller against the other party for breach of any representation or warranty contained in this Article VI must be brought, if at all, within eighteen (18) months after Closing or such claim and action shall be forever barred.

6.5     Covenants of Seller. At all times prior to Closing Seller shall:

(a)     Refrain from transferring any of the Property or creating on the Property any easements, liens, mortgages, encumbrances or other interests which would affect the Property or Seller's ability to comply with the terms of this Agreement;

(b)     Refrain from entering into any contracts or other commitments regarding the Property, other than in the ordinary and usual course of business, which may be cancelled at Closing without penalty, and which shall be cancelled by Sellers, as applicable, at Closing, without the prior written consent of Purchaser;

(c)     Refrain from entering into any leases without Purchaser's prior written consent;

(d)     Keep in effect Sellers' existing policies of insurance insuring the Property; and

(e)     Refrain from marketing the Property for sale any listings from any websites. Seller shall not negotiate any other offers to sell or lease the Property.

## ARTICLE VII.

## CONDITIONS PRECEDENT TO PURCHASER'S AND SELLER'S PERFORMANCE

7.1     Conditions to Purchaser's Obligations. Purchaser's obligation under this Contract to purchase the Property is subject to the fulfillment of each of the following conditions (any or all of which may be waived by Purchaser):

(a)     the representations and warranties of Seller contained herein shall be true, accurate and correct in all material respects as of the Closing Date;

(b)     Seller shall have performed all of its obligations required to be performed by Seller under this Agreement, as and when required by this Agreement;

(c)     Seller shall have delivered all the documents and other items required pursuant to Section 8.2(a), and shall have performed, in all material respects, all other covenants, undertakings and obligations, and complied with all conditions required by this Contract to be performed or complied with by Seller at or prior to the Closing;

(d)     between the date of this Contract and the Closing, there shall have been no intervening destruction or damage to or condemnation of the Property or any portion thereof or any material change in the physical condition thereof or the financial condition of the tenant thereof;

(e)     title to the Property shall be subject only to the applicable Permitted Exceptions, as defined in Section 4.2 hereof;

(f)     The Seller and Purchaser shall have entered into a new mutually acceptable written Lease (the "Lease") pursuant to which Purchaser shall lease the Property from Seller, which such Lease shall contain the following terms and conditions, unless otherwise mutually agreed to by Seller and Purchaser in the definitive Lease: (a) a term equal to twenty-three (23) years, (b) annual rent starting at $400,000 with 2% increases every lease year, (c) commencement date at Closing, (d) absolute or pure, triple net terms as a "bondable" lease, and (e) full corporate guaranty fom CJ Dalstop Holding AB or the principal parent for the first year of the lease term (provided that there is no default) and thereafter from CJ Automotive North America LLC; and

(g)     the Title Company must be willing to issue an owner's title policy to the Purchaser showing no exceptions other than the Permitted Exceptions and the "standard Exceptions".

7.2     Conditions to Seller's Obligations.  Seller's obligation under this Contract to sell the Property to Purchaser is subject to the fulfillment of each of the following conditions (any or all of which may be waived by Seller):

(a)     the representations and warranties of Purchaser contained herein shall be true, accurate and correct in all material respects as of the Closing Date; and

(b)     Purchaser shall have delivered the total Purchase Price, and other funds required hereunder and all the documents and other items required pursuant to Section 8.2(b).

## ARTICLE VIII.

## CLOSING

8.1     Closing Date.

(a)     Time and Place.  Provided the terms and conditions set forth in this Contract have been fulfilled, the consummation of the purchase and sale of the Property (the "**Closing**") shall take place by delivery of documents to the office of the Title Company, on or about the fifteenth (15th) day following the expiration of the Inspection Period (the "**Closing Date**"), or such time and place as the parties may mutually agree upon in writing. Purchaser shall have the option to extend the Closing Date by fifteen (15) days by delivering an additional Fifty Thousand Dollars ($50,000.00) in Current Funds to the Title Company and thereby increasing the Earnest Money Deposit to Two Hundred Fifty Thousand Dollars ($250,000.00).

(b)     Delivery of Documents in Escrow; Title Insurance.  The documents required hereunder to be delivered at Closing shall be delivered by Seller and Purchaser into escrow with the Title Company, which shall record and/or deliver all documents deposited into escrow hereunder upon payment of the Purchase Price to the Title

Company and shall remit the Purchase Price to Seller simultaneously with the recordation and/or delivery of all documents deposited into escrow hereunder and simultaneously with the issuance of the title policy in the form required in this Agreement.

8.2     Items to be Delivered at the Closing.

(a)     Seller.  At the Closing, Seller shall deliver, or cause to be delivered, to Purchaser each of the following items with respect to each Property:

(i)     the Lease, duly executed by Seller and all Lease guaranties;

(ii)     A Covenant or Special Warranty Deed for the Land, Improvements and Appurtenances, duly executed by Seller;

(iii)     A warranty Bill of Sale for the Personal Property;

(iv)     Non-Foreign Affidavit for Seller for purposes of compliance with Section 1445 (b)(2) of the Internal Revenue Code of 1986, as amended, and the regulations adopted thereunder;

(v)     A blanket bill of sale and assignment conveying to Purchaser the Contracts, Permits, Warranties and Plans;

(vi)     A certificate of Seller evidencing that the person or persons executing this Contract and the Closing documents on behalf of Seller have full right, power and authority to do so, and attaching appropriate resolutions authorizing this Contract and the transactions contemplated hereunder;

(vii)     A Certificate of Existence of Seller, as issued by the Secretary of the State of Indiana;

(viii)     a 1099 form;

(ix)     In the event that this is a sale of substantially all the assets of Seller or the Indiana bulk sales law shall be applicable, bulk sales clearance from the State of Indiana; and

(x)     Other items reasonably requested by the Title Company for the sale of the Property in accordance with this Contract or for administrative requirements for consummating the Closing, including, without limitation, a "no change affidavit" with respect to the existing survey and an owner's affidavit with respect to the deletion of the "standard exceptions".

(b)     Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered, to Seller or perform, as applicable, each of the following items with respect to each Property:

(i)     The total Purchase Price in Current Funds plus or minus

prorations;

   (ii) Such additional funds in cash or Current Funds, as may be necessary to cover Purchaser's share of the Closing costs and prorations hereunder;

   (iii) The Lease, dated as of the Closing Date, duly executed by Purchaser;

   (iv) If the Purchaser is corporation, partnership or other entity, a certificate from an officer of Purchaser, or the general partner of Purchaser, evidencing that the person or persons executing this Contract and the Closing documents on behalf of Purchaser have full right, power and authority to do so, and attaching the articles of incorporation and bylaws (or other appropriate organizational documents) of Purchaser and appropriate resolutions authorizing this Contract and the transactions contemplated hereunder;

   (v) All documents reasonably required for the Seller Financing, duly executed by Purchaser; and,

   (vi) Other items reasonably requested by the Title Company for the sale of the Property in accordance with this Contract or for administrative requirements for consummating the Closing.

  8.3 <u>Costs of Closing</u>. Purchaser shall pay for the following costs and expenses related to the transfer of the Property: (i) all costs and expenses incurred by Purchaser in connection with its due diligence investigation of the Property; (ii) all premiums charged by the Title Company for any endorsements or extended coverage to the new Owner's Title Policy except any Lender's Policy; (iii) one-half of escrow fees charged by Title Company; (iv) recording fees incurred in connection with this transaction.  Seller agrees to pay: (a) one-half of escrow fees charged by Title Company, (b) all search and exam fees and all premiums charged by the Title Company for the base new Owner's Title Policy and and (c) transfer taxes and other governmental taxes incurred in connection with this transaction.  Each party shall pay its own legal fees and advisory fees incidental to the execution of this Contract and the consummation of the transactions contemplated herein.  Any other costs or expenses shall be allocated in accordance with local custom. The provisions of this Section 8.3 shall survive the Closing or earlier termination of this Contract.

  8.4 <u>Prorations</u>. There shall be proration of taxes, utility expenses and all items usually prorated in transactions of the type described herein. Seller shall cause utility readings as close to Closing as possible.  In addition, the tenant shall pay the first month's rent and security deposit under the terms of the Lease at Closing.  The provisions of this Section 8.4 shall survive the Closing.

## ARTICLE IX.

## CONDEMNATION OR CASUALTY

9.1     Condemnation. In the event that all or any portion of the Property is condemned or taken by eminent domain or conveyed by deed in lieu thereof, or if any condemnation proceeding is threatened or commenced for all or any portion of the Property prior to Closing, Purchaser may elect to terminate this Contract by written notice thereof to Seller within ten (10) days after Purchaser is notified of the condemnation, taking or deed in lieu or institution of such condemnation proceeding. Upon termination of this Contract as to the Condemned Property as provided in this Section 9.1, all rights, duties and obligations hereunder shall cease and be of no further force or effect (except with respect to the provisions hereof which expressly survive the termination of this Contract), and the Earnest Money Deposit shall be returned to Purchaser. If Purchaser does not terminate this Contract as aforesaid, then both parties shall proceed to close the transaction contemplated herein pursuant to the terms hereof, in which event Purchaser shall be assigned all rights to receive any condemnation proceeds with respect to such condemnation or taking and there shall be no reduction in the Purchase Price.

9.2     Casualty. In the event that any portion of the Property shall be damaged or destroyed by fire or other casualty prior to Closing, Purchaser may terminate this Contract by written notice thereof to Seller within ten (10) days after Purchaser is notified of the casualty. Upon termination of this Contract as provided in this Section 9.2, all rights, duties and obligations hereunder shall cease and be of no further force or effect (except with respect to the provisions hereof which expressly survive the termination of this Contract), and the Earnest Money Deposit shall be returned to Purchaser. If Purchaser does not terminate this Contract as aforesaid, then both parties shall proceed to close the transaction contemplated herein pursuant to the terms hereof, in which event Purchaser shall be assigned all rights to receive any insurance proceeds with respect to such casualty and  there shall be no reduction in the Purchase Price except that Purchaser shall receive a credit for any deductible.

## ARTICLE X.

## DEFAULTS AND REMEDIES

10.1     Default by Purchaser. If Seller shall not be in default hereunder and Purchaser refuses or fails to consummate the Closing under this Contract for reasons other than as expressly set forth in Section 5.2 or Article IX hereof or other than due to a failure of a condition precedent to Purchaser's obligation to close as set forth in Section 7.1 hereof (provided that if the failure of such condition precedent is caused by Purchaser's breach of or default under this Contract, Purchaser shall nonetheless be obligated to proceed with Closing notwithstanding the failure of such condition precedent), after the expiration of ten (10) days after notice from Seller during which Purchaser shall have the right to cure such default, Seller may, as their sole and exclusive remedy, terminate this Contract in which event the Title Company shall pay the Earnest Money Deposit to Seller and Seller shall be entitled to receive and retain the Earnest Money Deposit as liquidated damages (Seller and Purchaser hereby acknowledging that the amount of damages in the event of Purchaser's default is difficult or impossible to ascertain but that such amount is a fair estimate of such damages), and neither party shall have any further

rights, duties, or obligations hereunder except with respect to the provisions hereof which expressly survive the termination of this Contract.

10.2 <u>Default by Seller</u>. If Purchaser shall not be in default hereunder and if Seller refuse or fail to consummate the Closing under this Contract other than due to a termination permitted under this Contract or a failure of a condition precedent to Seller's obligation to close as set forth in Section 7.2 hereof, after the expiration of ten (10) days after notice from Purchaser during which Seller shall have the right to cure such default, Purchaser may, at Purchaser's sole option and as its sole and exclusive remedies, either (a) terminate this Contract in consideration of liquidated damages paid by Seller to Purchaser in the amount of Sventy-Five Thousand Dollars ($75,000) and neither party shall have any further rights, duties or obligations hereunder except with respect to the provisions of this Contract which expressly survive the termination hereof, and Purchaser shall be entitled to a refund of the Earnest Money Deposit, or (b) enforce specific performance of this Contract against Seller. Seller shall not be liable to Purchaser for any damages, including, without limitation, any actual, punitive, speculative or consequential damages or damages for loss of opportunity or lost profit.

10.3 <u>Attorneys' Fees</u>. If it shall be necessary for either Purchaser or Seller to employ an attorney to enforce its rights pursuant to this Contract, the non-prevailing party shall reimburse the prevailing party for its reasonable attorneys' fees. The provisions of this Section 10.3 shall survive the Closing or termination of this Contract.

## ARTICLE XI.

## BROKERAGE COMMISSIONS

11.1 <u>Brokerage Commission</u>. Provided that the transaction contempated herein closes and the Purchase Price has been paid, IKON Investments ("**IKON**") shall receive a Commission equal to six percent (6%) of the Purchase Price from Seller, which is due at Closing. Purchaser and Seller each agree to indemnify, defend and hold the other harmless for, from and against any and all loss, liability, damage, cost or expense (including, without limitation, reasonable attorneys' fees) arising out of or paid or incurred by such party by reason of any claim to any broker's, finder's or other fee in connection with this transaction by any party claiming by, through or under such party other than IKON. The indemnity obligations set forth in this Section 11.1 shall survive the Closing or the termination of this Contract.

## ARTICLE XII.

## NO ASSUMPTION OF LIABILITIES

The parties acknowledge that this transaction contemplates only the sale and purchase of the Property and that Seller is not selling a business nor do the parties intend that Purchaser be deemed a successor of Seller with respect to any liabilities of Seller to any third party. Except for the foregoing, Purchaser shall neither assume nor be liable for any of the debts, liabilities, taxes or obligations of, or claims against, Seller, or of any other person or entity, of any kind or nature, whether existing now, on the Closing or at any time thereafter. All of such debts, liabilities, taxes, obligations and claims shall be solely those of Seller, and Seller hereby represents, warrants, covenants and agrees to defend, indemnify and hold harmless Purchaser

from any liability with respect thereto. The debts, liabilities, taxes, obligations and claims for which Seller alone is liable shall include, without limitation (a) all payments and benefits to past and/or present employees of any of the Seller in connection with the business being conducted on or from the Property as may have accrued through the Closing (including, but not limited to, salaries, wages, commissions, bonuses, vacation pay, health and welfare contributions, pensions, profit sharing, severance or termination pay, or any other form of compensation or fringe benefit); (b) obligations of Seller under any Contracts prior to the Closing; (c) all liabilities of any kind whatsoever in connection with the operation of the Property prior to the Closing; and (d) the breach of any representation or warranty made hereunder by Seller.

Purchaser shall be fully responsible for and shall indemnify and hold Seller harmless with respect to: (a) the operation of the Property on and after the Closing Date; and the breach of Purchaser's representations or warranties under this Agreement.

This Article XII shall survive the Closing and not be merged therein and shall also survive any termination of this Contract.

## ARTICLE XIII.

### MISCELLANEOUS

13.1    <u>Notices</u>.  Any notice provided or permitted to be given under this Contract must be in writing and may be served by depositing the same in the United States Mail, postage prepaid, certified or registered mail with return receipt requested, or by delivering the same in person to the party to be notified via a delivery service, Federal Express or any other nationally recognized overnight courier service that provides a return receipt showing the date of actual delivery of same to the addressee thereof, or by facsimile or email copy transmission with proof of receipt.  Any party giving notice hereunder shall use reasonable efforts to send a copy of any such notice by facsimile or email transmission on the same date as deposited in the mail or given to such delivery service.  Notice given in accordance herewith shall be deemed given and shall be effective upon the earlier of actual receipt (including, without limitation, receipt of a facsimile transmission) or refusal of delivery.  For purposes of notice, the addresses of the parties shall be as follows:

| | |
|---|---|
| Seller: | CJ Automotive Indiana, LLC |
| | Attention: Raymond Bomya |
| | 100 Commerce Street |
| | Butler, IN 46721 |
| | Ray.Bomya@cjautomotive.com |
| | |
| Copy: | Paesano Akkashian Apkarian PC |
| | Attention: Anthony R. Paesano |
| | 7457 Franklin Road, Ste 200 |
| | Bloomfield Hills, MI 48301 |
| | Phone: (248) 952-9400 |

apaesano@paalawfirm.com

Buyer:                    Butler Propco LLC
                          c/o Vantage Holdings Group LLC
                          Attention : Jonathan Fine
                          200 Park Avenue, Suite 1700
                          New York, NY 10166
                          Phone : (212) 850-8113
                          jfine@vantageh.com

With a mandatory
Copy to:                  Plunkett Cooney PC
                          Attention: Howard Goldman
                          38505 Woodward, Suite 100
                          Bloomfield Hills, MI 48304
                          hgoldman@plunkettcooney.com

Title Company:            Amrock LLC
                          201 West Big Beaver Road, Suite 160
                          Troy, Michigan, 48084-4169
                          Phone: (313) 877-1776
                          BobPowell@Amrock.com

13.2    GOVERNING LAW.   THE LAWS OF THE STATE OF INDIANA SHALL GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT AND INTERPRETATION OF THIS CONTRACT.

13.3    Entirety and Amendments.  This Contract embodies the entire agreement between the parties and supersedes all prior agreements and understandings, if any, relating to the transaction described herein, and may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

13.4    Assignment.  Purchaser may assign its rights under this Contract to an entity controlling, controlled by, or under common control with Purchaser without the prior written consent of Seller; provided, that any such assignment must be made in a timely manner so as not to adversely affect the timing of Closing; and, provided, further, that Purchaser must promptly provide Seller with a copy of any instrument assigning this Contract.  Except as expressly provided in the preceding sentence, this Contract may not be assigned in whole or in part by Purchaser without the prior written consent of Seller, not to be unreasonably withheld, conditioned or delayed. In the event of an assignment of this Contract by Purchaser, Purchaser shall not be released from any liability or obligations hereunder, and Purchaser shall promptly deliver to Seller a copy of the instrument effecting such assignment. Subject to the foregoing, this Contract shall be binding upon and inure to the benefit of Seller and Purchaser and their respective heirs, personal representatives, successors and assigns.

13.5    Survival.  Except as otherwise expressly provided herein, no representations, warranties, covenants or agreements contained in this Contract shall survive the termination of

-16-

this Contract or the Closing and the assignment of the Property hereunder.

13.6    Multiple Counterparts. To facilitate execution, this Contract may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature or acknowledgment of, or on behalf of, each party, or that the signature of all persons required to bind any party, or the acknowledgment of such party, appear on each counterpart. Facsimile or email copies of a signature of any party shall be deemed the same as the original. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Contract to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, and the respective acknowledgments of, each of the parties hereto. Any signature or acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures or acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature or acknowledgment pages.

13.7    Risk of Loss. Subject to the provisions of Article IX of this Contract, risk of loss or damage to the Improvements, or any part thereof, by fire or any other casualty from the date this Contract is fully executed up to the time of Closing will be on Seller and, thereafter, will be on Purchaser.

13.8    Effective Date. As used herein, the term **"Effective Date"** shall mean for all purposes in this Contract the date on which both Seller and Purchaser have executed a counterpart of this Contract and delivered same to the Title Company. The Title Company shall deliver original counterparts of the Contract to each party within one (1) business day after its receipt of same.

13.9    No Recordation of Contract. In no event shall this Contract or any memorandum hereof be recorded in the public records of the state or county in which any portion of the Land is situated, and any such recordation or attempted recordation shall constitute a breach of this Contract by the party responsible for such recordation or attempted recordation.

13.10    Business Days. All references to "business days" contained herein are references to normal working business days, i.e., Monday through Friday of each calendar week, exclusive of federal and national bank holidays. In the event that any event hereunder is to occur, or a time period is to expire, on a date which is not a business day, such event shall occur or time period shall expire on the next succeeding business day.

13.11    Captions. The captions, headings and arrangements used in this Contract are for convenience only and do not in any way affect, limit, amplify or modify the terms and provisions hereof.

13.12    Number and Gender of Words. Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender shall include each other gender where appropriate.

13.13    Interpretation. No provision of this Contract shall be construed in favor of, or against, any particular party by reason of any presumption with respect to the drafting of this Contract; both parties, being represented by counsel and having fully participated in the

negotiation of this instrument, hereby agree that this Contract shall not be subject to the principle that a contract would be construed against the party which drafted the same.

13.14 <u>Incorporation of Exhibits</u>. All exhibits attached and referred to in this Contract are hereby incorporated herein as though fully set forth in (and shall be deemed to be a part hereof) this Contract.

13.15 <u>Third-Party Beneficiaries</u>. Nothing in this Contract, express or implied, is intended to confer any rights or remedies upon any person, other than the parties hereto and, subject to the restrictions on assignment herein contained, their respective successors and assigns.

13.16 <u>Faxed or Emailed Signatures</u>. The parties agree that faxed or emailed signatures may be used to expedite the transaction contemplated by this Contract. Each party intends to be bound by its faxed or emailed signature and each is aware that the other will rely on the faxed or emailed signature, and each acknowledges such reliance and waives any defenses to the enforcement of the documents effecting the transaction contemplated by this Contract based on a faxed or emailed signature.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have executed this Contract of Purchase and Sale to be effective as of the Effective Date.

SELLER:

CJ AUTOMOTIVE INDIANA LLC,
an Indiana limited liability company

By:

Date:   June 25 2021

**PURCHASER:**

BUTLER PROPCO LLC,
a Delaware limited liability company

By:

Name: Jonathan Fine
Title:  Authorized Signatory

Date:   June 25, 2021

## RECEIPT OF INITIAL EARNEST MONEY DEPOSIT
## AND AGREEMENT OF TITLE COMPANY

Upon receipt, the Title Company agrees to hold the Initial Earnest Money Deposit and the additional Earnest Money Deposit in escrow as escrow agent for the benefit of Seller and Purchasers and to dispose of same in strict accordance with the terms and provisions of this Contract.

AMROCK LLC

By: _____

Date: June ____, 2021

**SCHEDULE 5.3**

<u>**Submission Matters**</u>

1. Consolidated property level monthly financial records and operating statements for the current year 2021 and annually for 2016 – 2020 including capital expenditures, tenant improvements, tax bills, maintenance records.

2. Any information related to property, school, or real estate tax assessments or appeals.

3. ~~Copies of all open agreements, contracts, and sub-leases with respect to the Property.~~

4. Tenant Leases – including amendments, side letters, option exercise letters, pending documents, or any documentation related to any of the Tenant or Sub-Tenant Leases within any of the properties.

5. A description, and corresponding invoice, of any major capital improfements or material repairs that have been made of the Property within the past 36 months.

6. Property surveys if in Seller's possession.

7. Copies of any open City, County, State of Federal violations, cirations or fines.

8. Copies of all current permits, license, certificates of occupancy and certifications (including lead) for the Property.

9. Copy of Seller's existing title report.

10. Copies of any outstanding litigation notices against the Seller in relation to the Property.

11. Audited financial statements – income and balance sheet – from 2014 to current year.

12. An itemized schedule detailing all major equipment within the Property and their respective cost.

13. A copy of any loans collateralized by equipment within the Property.

# EXHIBIT A

For APN/Parcel ID(s):    17-07-11-126-003.000-027 and

PARCEL 1:

A PART OF THE NORTHWEST QUARTER OF SECTION 11, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN SAID COUNTY AND STATE, BOUNDED BY A LINE COMMENCING AT A POINT 437 FEET WEST OF THE NORTHEAST CORNER OF THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 11, AS AFORESAID; AND RUNNING FROM THENCE SOUTH 1,055 FEET TO THE NORTH BOUNDARY LINE OF THE RIGHT OF WAY OF THE LAKE SHORE AND MICHIGAN SOUTHERN RAILWAY COMPANY (NOW THE NEW YORK CENTRAL RAILROAD COMPANY); THENCE IN A WESTERLY DIRECTION, ALONG THE NORTH BOUNDARY LINE OF SAID TRACT, 459.06 FEET; THENCE NORTH ON A LINE PARALLEL WITH THE EAST BOUNDARY LINE OF SAID TRACT, 1037.02 FEET TO THE NORTH BOUNDARY LINE OF SAID NORTHWEST QUARTER AS AFORESAID; THENCE EAST ALONG THE NORTH BOUNDARY LINE OF SAID NORTHWEST QUARTER 459.06 FEET TO THE PLACE OF BEGINNING.

PARCEL 2:

LOT NUMBERED NINE (9) IN G. T. JOHN'S ADDITION TO THE TOWN, NOW CITY OF BUTLER, DEKALB COUNTY, INDIANA.

PARCEL 3:

COMMENCING AT A POINT ON THE NORTH LINE OF SECTION 11, TOWNSHIP 34 NORTH, RANGE 14 EAST AND ON THE CENTER LINE OF U.S. HIGHWAY #6, THIS POINT BEING 1,413 FEET EAST OF THE NORTHWEST CORNER OF SAID SECTION 11; THENCE SOUTH 00 DEGREES 30 MINUTES WEST 1.023.9 FEET; THENCE SOUTH 87 DEGREES 30 MINUTES EAST 331.8 FEET, THENCE NORTH 1037.02 FEET TO A POINT ON THE NORTH LINE OF SAID SECTION 11, AND THE CENTER LINE OF U.S. #6. THENCE WEST 308 FEET TO THE PLACE OF BEGINNING.

Open.28568.12720.26672592-2