# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BUTLER PROPCO, LLC,
a Delaware limited liability company,

               Plaintiff,

v.

CJ AUTOMOTIVE INDIANA, LLC,
an Indiana limited liability company,

               Defendant.

Case No. 2021_____
Hon.
Maj. Judge

---

PLUNKETT COONEY
Matthew J. Boettcher (P40929)
Attorneys for Plaintiff
38505 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 901-4035
mboettcher@plunkettcooney.com

---

**COMPLAINT FOR SPECIFIC PERFORMANCE AND
OTHER LEGAL AND EQUITABLE RELIEF**

Plaintiff, Butler Propco, LLC ("Plaintiff"), by its attorneys, Plunkett Cooney, for its Complaint against Defendant, CJ Automotive Indiana, LLC ("Defendant"), states:

## THE PARTIES

1.      Plaintiff is a limited liability company.  Plaintiff's members are Jonathan Fine and Tesael Investments II, LLC.  Mr. Fine is domiciled in the State of New York.  The sole member of Tesael Investments II, LLC is Jaime Ellstein.  Mr. Ellstein is domiciled in Mexico and the State of Florida. Accordingly, for diversity purposes Plaintiff is deemed a citizen of New York, Mexico and Florida.

2.      Defendant is a limited liability company.  Upon information and belief, Defendant's sole member is CJ Automotive USA, Inc., which is a Delaware corporation with its principal place of business located in Indiana. Accordingly, for diversity purposes Defendant is a citizen of Delaware and Indiana.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this dispute under 28 U.S.C. 1332 as there is complete diversity between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

4.     In addition, Plaintiff is seeking declaratory relief and specific performance of an agreement to buy and sell real estate and other property. This Court has the authority to declare the parties' rights under 28 U.S.C. 2201(a) and Rule 57 of the Federal Rules of Civil Procedure.

5.     Venue is proper in this District under 28 U.S.C. 1391(b)(2) as a substantial part of the events giving rise to the claims pled occurred in this District.

## FACTUAL ALLEGATIONS

6.     On May 18, 2021, Plaintiff and Defendant signed a Letter of Intent to begin memorializing their agreement through which Plaintiff was purchasing certain real property located in Butler, Indiana (the "Land").

7.     In addition, Plaintiff agreed to purchase various improvements and appurtenances located on or pertaining to the Land.

8.     The sale and purchase contemplated by the Letter of Intent also included Plaintiff's purchase of certain "Personal Property," "Contracts," "Permits," "Warranties" and "Plans."

9.     The Land, Improvements, Appurtenances, Personal Property, Contracts, Permits, Warranties and Plans that are part of the sale and purchase are hereafter referred to as the "Property."

10.     Beginning on or about May 25, 2021, draft copies of a "Contract of Purchase and Sale" and "Commercial Lease Agreement" were delivered by Defendant to Plaintiff.

11.     Between June 7 and 25, 2021, the parties, through their counsel, negotiated over the terms of the Contract of Purchase and Sale.

12.     On June 25, 2021, the parties signed the Contract of Purchase and Sale to sell and purchase the Property.  *See*, **Exhibit A**.

13.     The "Effective Date" of the Contract of Purchase and Sale was June 25, 2021.

14.     Paragraph 2.1 of the Purchase and Sale Agreement provides for a purchase price for the Property of $4,200,000.

15.     As required by ¶3.1 of the Purchase and Sale Agreement, Plaintiff paid into escrow an "Earnest Money Deposit" of $150,000 which was to be held by the escrow agent and applied to the purchase price for the Property or disbursed in accordance with the Purchase and Sale Agreement.

16.     The Contract of Purchase and Sale refers to a certain "Commercial Lease Agreement" (the "Lease").

17.     As part of the sale and purchase of the Property Plaintiff also was to lease certain property from Defendant.

18.     On or about June 18th through July 15, 2021, the parties were negotiating the terms of the Lease.

19.     Paragraph 4.1 of the Contract of Purchase and Sale required Defendant to provide various documents demonstrating its title to the Property.

20.     In addition, ¶5.1 of the Purchase and Sale Agreement provided Plaintiff with a 30-day "Inspection Period" during which Plaintiff was permitted to examine Defendant's Title Policy, Title Commitment, any Exception Documents, Existing Surveys and Submission Matters all as defined in ¶4.1, as well as any other documents, items and the Property itself.

21.     On July 26, 2021, Plaintiff sent Defendant a title and survey objection letter listing issues to be addressed prior to a closing on the sale and purchase of the Property.  *See*, **Exhibit B**.

22.     By then the parties had conducted a Phase I environmental inspection but it could not conclusively show if the Land was environmentally contaminated.  Accordingly, Plaintiff commissioned a more thorough Phase 2 environmental report which delayed completion of the Inspection Period.

23.     Accordingly, and because of the various property issues that had by then been identified, on July 26, 2021, the parties also executed a "First

Amendment To Contract Of Purchase And Sale" thereby extending Plaintiff's Inspection Period until August 6, 2021. *See*, **Exhibit C**.

24.     Even so, Plaintiff understood that the sale and purchase would proceed, and the parties scheduled a closing for August 16, 2021. *Id*.

25.     On or about August 3, 2021, the parties' counsel were discussing the Property title issues including an easement needed to service the Land.

26.     On or about August 5-6, 2021, Defendant's counsel contacted the City of Butler attempting to obtain the easement needed to service the Land.

27.     By August 9, 2021, Defendant's counsel was assuring Plaintiff's counsel that he was continuing to work toward resolving the easement issue so that the sale and purchase could close as scheduled on August 16, 2021.

28.     Further, as early as May 2021 Defendant had pointed out to Plaintiff during a tour of the Land that the roof on the building on the Land leaked.  This condition was consistent with a property condition report earlier received calling for over $730,000 of roof repairs and replacements by 2022.

29.     During the parties' discussions and negotiations Defendant had acknowledged that the roof repairs would be needed as part of the sale and purchase of the Property.

30.     However, because of labor shortages stemming from the Covid-19 pandemic, and due in part to the isolated nature of the Land in Butler Indiana,

the first bid to repair the roof, from Landmark Roofing, was not obtained until July 30, 2021.

31.     After receiving the Landmark Roofing repair quote, the parties continued discussing ways to resolve the remaining property issues prior to the scheduled closing.

32.     In reliance on Defendant's representations, on Friday, August 13, 2021, Plaintiff's counsel prepared and sent to Defendant's counsel copies of the closing documents needed for the closing scheduled for August 16, 2021 including specifically (a) a Special Warranty Deed; (b) a Bill of Sale; (c) a Blanket Transfer and Assignment; (d) a Foreign Investment in Real Property Tax Act withholding document; (e) the Indiana Sale Disclosure forms, (f) the Commercial Lease Agreement; and (g) a Commercial Lease Guaranty.

33.     As of August 13th, Defendant expressed no objection to proceeding to a closing asserting only that "[w]e reviewed the most recent proposal and our position remains that this is a late change and we do not accept any changes from the agreement and have now missed the possibility to close as agreed on Monday August 16 as previously agreed." *See*, **Exhibit D**.

34.     The sale and purchase did not close on August 16, 2021.

35.     As of August 16, 2021, Defendant had not signed and returned any of the closing documents needed to complete the sale of the Property.

36.     As of August 16, 2021, Plaintiff was ready, willing and able to close on the sale and purchase of the Property.

37.     That same day Jonathan Fine, on Plaintiff's behalf, wrote to Ray Bomya, for Defendant, stating that Plaintiff was willing to close despite the open issues of the easement servicing the Land and the leaking building roof:

> It was great speaking with you earlier.  As we discussed, our side was prepared to close today and would like to ensure that a closing happens as soon as possible. . .  I also want to reemphasize that we are ok with legal issues such as neighboring easements be resolved post-closing in order to make sure that you are accessing liquidity as soon as possible.  Our priority has always been to close with you promptly under terms that you feel are fair and reasonable.  Your attorney has received all of the applicable closing documents in order to prepare for what could have been closed today.  We are ready to wire once the lease has been signed and Tony confirms the settlement statements.

*See*, **Exhibit E**.

38.     As of August 16, 2021, Defendant was not claiming the Contract of Purchase and Sale had terminated.  Instead, Defendant was acknowledging Plaintiff's intention to close and was merely seeking to delay the closing, stating, "I saw you tried to call. I am booked heavy today with meetings.  We will need a day or so.  We are evaluating what our next steps need to be from the Sweden side." *See*, **Exhibit F**.

39.     Unknown to Plaintiff, on July 21, 2021, and in clear violation of ¶6.5 of the Contract of Purchase and Sale, Defendant had secretly obtained a

mortgage loan and encumbered the Land with a Commercial Mortgage. *See*, **Exhibit G**.

40.     Accordingly, after July 21, 2021 Defendant was unable to close of the sale and purchase of the Property without triggering a due on sale clause in the mortgage encumbering the Land.  Defendant also wrongfully withheld that information from Plaintiff.

41.     Compounding its wrongful breach of the Contract of Purchase and Sale, Defendant concocted an excuse for its failure to close which it sent to Plaintiff on August 18, 2021 entitled "Notice of Termination."  *See*, **Exhibit H**.

42.     Citing ¶5.2 of the Contract of Purchase and Sale, Defendant wrongly attempted to justify its refusal to close insisting that weeks earlier Plaintiff did not "timely deliver to [Defendant] written notice of termination during the Inspection Period."

43.     Put simply, Defendant is contending that despite working for weeks toward a closing on its Purchase of the Property Plaintiff had actually terminated the contract back on August 6th.

44.     Defendant's reliance on ¶5.2 is legally and factually wrong, amounting to nothing more than a bald attempt to hide its own wrongful conduct and breach of the Contract of Purchase and Sale.

45.     Paragraph 5.2 is a termination provision solely for Plaintiff's

benefit.  That paragraph provides only that:

> If Purchaser determines at any time prior to the expiration of the
> Inspection Period that the Property is not satisfactory to
> Purchaser for any reason or for no reason whatsoever in
> Purchaser's sole and absolute discretion, then Purchaser may
> terminate this Contract by delivering written notice of
> termination to Seller prior to the end of such Inspection Period.  If
> Purchaser properly terminates this Contract pursuant to this
> Section 5.2, then this Contract shall be terminated, the Title
> Company shall return the Earnest Money Deposit to Purchaser
> upon the unilateral direction of Purchaser and notwithstanding
> any contrary direction from Seller, and neither party shall have
> any further rights, duties or obligations hereunder except with
> respect to the provisions of this Contract which expressly survive
> the termination of this Contract.  If Purchaser does not timely
> deliver to Seller written notice of termination during the
> Inspection Period, the conditions of this Section 5.2 shall not be
> deemed satisfied, and Purchaser shall be deemed to terminate this
> Contract pursuant to this Section 5.2.

46.     Paragraph 5.2 of the Contract of Purchase and Sale exists solely

for Plaintiff's benefit and permits Plaintiff to terminate the Contract of

Purchase and Sale should it decide not to proceed with the purchase in its

"sole and absolute discretion."

47.     Nothing in ¶5.2 permits Defendant to terminate the Contract of

Purchase and Sale, for any reason.

48.     After July 21ˢᵗ, Defendant was well aware that Plaintiff intended to close on the sale and purchase of the Property and that as of August 16ᵗʰ Plaintiff stood ready, willing and able to close.

## COUNT I – REQUEST FOR DECLARATORY RELIEF

49.     Plaintiff incorporates by reference the preceding allegations of the Complaint.

50.     The parties agreed to sell and purchase the Property under the terms of the Contract of Purchase and Sale.

51.     Defendant's attempt to terminate the sale and purchase by invoking ¶5.2 while wrongful, it calls into question the parties' rights and obligations under Contract of Purchase and Sale.

52.      Plaintiff stands ready to close on the sale and purchase of the Property under the terms of the Contract of Purchase and Sale, but Defendant has wrongfully refused insisting that Plaintiff terminated the contract on August 6, 2021.

53.     An actual controversy exists over the parties' respective rights and obligations under the Contract of Purchase and Sale.

WHEREFORE, Plaintiff requests that the Court determine the parties' respective rights and obligations and grant the necessary relief as follows:

A.    Determine that the Contract of Purchase and Sale remains valid and enforceable;

B.    Conclude that Defendant's purported termination of the Contract of Purchase and Sale by invoking ¶5.2 is of no force or effect;

C.    Order Defendant to proceed with the closing of the sale of the Property under the terms of the Contract of Purchase and Sale;

D.    Award Plaintiff damages as supported by the facts and evidence in this case;

E.    Award Plaintiff its costs and expenses incurred, including interest and attorney fees, in pursuing this matter as permitted under ¶10.3 of the Contract of Purchase and Sale; and

F.    Award Plaintiff such other relief as the court deems just.

## COUNT II – SPECIFIC PERFORMANCE OF THE CONTRACT OF PURCHASE AND SALE

54.    Plaintiff incorporates by reference the preceding allegations of the Complaint.

55.    The parties agreed to the sale and purchase of the Property under the terms of the Contract of Purchase and Sale.

56.    Plaintiff stands ready, willing and able to close on the purchase of the Property, but Defendant has wrongfully refused.

57.     Defendant has intentionally breached the Contract of Purchase and Sale by its refusal to close on the sale and by its wrongful encumbering of the Land with a commercial mortgage.

58.     As a result of Defendant's breach of the Contract of Purchase and Sale and the damages Plaintiff will incur as result of Defendant's breach, the Contract of Purchase and Sale should be specifically enforced.

WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

A.     Ordering Defendant to proceed with the sale of the Property under the terms of the Contract of Purchase and Sale;

B.     Awarding Plaintiff damages as supported by the facts and evidence in this case;

C.     Awarding Plaintiff its costs and expenses incurred, including interest and attorney fees as permitted under ¶10.3 of the Contract of Purchase and Sale; and

D.     Awarding Plaintiff such other relief as the court deems just.

## COUNT III – BREACH OF CONTRACT

59.     Plaintiff incorporates by reference the preceding allegations of the Complaint.

60.     Plaintiff and Defendant signed the Contract of Purchase and Sale whereby the parties agreed to sell and purchase the Property.

61.     Defendant breached the Contract of Purchase and Sale by refusing to close on the sale and by wrongly encumbering the Land with a commercial mortgage without Plaintiff's knowledge or consent.

62.     As a result of Defendant's breach Plaintiff is entitled to specific performance as requested in Count II.

63.     As an alternative request for relief, Plaintiff is entitled to recover its damages as a result of Defendant's breach of contract.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant as follows:

A.      Ordering Defendant to proceed with the sale of the Property under the terms of the Contract of Purchase and Sale;

B.      Awarding Plaintiff damages as supported by the facts and evidence in this case;

C.      Awarding Plaintiff its costs and expenses incurred, including interest and attorney fees as permitted under ¶10.3 of the Contract of Purchase and Sale; and

D.      Awarding Plaintiff such other relief as the court deems just.

PLUNKETT COONEY

BY: _/s/ Matthew J. Boettcher_
Matthew J. Boettcher (P40929)
Attorneys for Plaintiff
38505 Woodward Ave. Ste. 100
Bloomfield Hills, MI 48304
(248) 901-4035
mboettcher@plunkettcooney.com

Dated: August 30, 2021

Open.28568.12720.27036968-1

## INDEX OF EXHIBITS

**Ex. A:**     Contract of Purchase or Sale

**Ex. B:**     Title and Survey Objection Letter

**Ex. C:**     First Commitment To Contract of Purchase and Sale

**Ex. D:**     August 13, 2021 Email

**Ex. E:**     August 16, 2021 Email

**Ex. F:**     August 16, 2021 Email

**Ex. G:**     Mortgage

**Ex. H:**     Notice of Termination Letter

Open.P0828.P0828.27076762-1

# EXHIBIT A

## CONTRACT OF PURCHASE AND SALE

THIS CONTRACT OF PURCHASE AND SALE (this "**Contract**") is made and entered into as of the Effective Date (as defined in Section 13.8 hereof) by and between CJ Automotive Indiana, LLC, an Indiana limited liability company ("**Seller**") and Butler Propco LLC, a Delaware limited liability company, or assigns ("**Purchaser**").

### ARTICLE I.

### SALE OF THE PROPERTY

1.1    Subject Property.  For the consideration and upon and subject to the terms, provisions and conditions of this Contract, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the following:

(a)    those certain parcels of real property known and numbered as 100 Commerce Street, W. Main Street and W. Oaks Street in Butler, Indiana and as more fully described on Exhibit A attached hereto together with all easements, air, mineral and riparian and development rights and all rights, privileges, servitudes and appurtenances thereunto belonging or appertaining, including all right, title and interest in and to the streets, alleys and rights-of-way adjacent to the Land and any rights of use, servitudes, licenses, permits, tenements, hereditaments, privileges and appurtenances belonging or in any way pertaining to such real property and the Improvements (collectively the "**Land**");

(b)    all building structures, improvements and fixtures, including heating, lighting, plumbing, electrical and air-conditioning equipment, located on the Land improvements (the "**Improvements**") and appurtenances (the "**Appurtenances**") located on or pertaining to the Land;

(c)    all of the personalty, equipment, inventory, supplies and personal property located on, and used for the operation of, the Land, and not used in, or for the operation of, the Seller's business thereon, including, without limitation, any landscaping equipment and all heating, lighting, plumbing, electrical and air-conditioning fixtures and equipment, situated in or about the Land, used in the operation of the Land (the "**Personal Property**"); by way of clarification, Personal Property does not include Seller's trade fixtures, business equipment, parts, work-in-process, raw materials, inventory and supplies, or any of Seller's furniture, computers and office equipment or supplies;

(d)    all service and maintenance contracts related to the Land listed on Exhibit B and agreed to be assumed by the Purchaser during the Investigation Period (the "**Contracts**");

(e)    all, licenses, permits, certificates of occupancy and franchises for the Land or Improvements (the "**Permits**");

(f)    all unexpired warranties relating to the Land and the Improvements (the "**Warranties**"); and

(g)     all plans and specifications relating to the construction of the Improvements (the **"Plans"**).

The Land, Improvements, Appurtenances, Personal Property, Contracts, Permits, Warranties and Plans are collectively referred to herein as the **"Property"**.

## ARTICLE II.

### PURCHASE PRICE

2.1     Purchase Price.  The total Purchase Price (herein so called) to be paid by Purchaser to Seller for the Property is the sum of Four Million Two Hundred Thousand Dollars ($4,200,000.00) (the **"Purchase Price"**) plus or minus prorations.

## ARTICLE III.

### EARNEST MONEY DEPOSIT

3.1     Earnest Money Deposit.  Within three Business Days after the Effective Date, Purchaser shall deliver to Amrock Title LLC, located at 201 West Big Beaver Road, Suite 160, Troy, Michigan, 48084-4169 Attention: Robert Powell (the **"Title Company"** or **"Escrow Agent"**), an amount equal to One Hundred Fifty Thousand Dollars ($150,000.00) (this, and any additional amounts, as provided herein, the **"Earnest Money Deposit"**) in Current Funds, to be held by the Title Company in escrow to be applied or disposed of by the Title Company as is provided in this Contract. Provided that Purchaser has not terminated this Contract pursuant to the terms hereof, on the business day immediately following the Inspection Period, Purchaser shall deliver an additional Fifty Thousand Dollars ($50,000.00) in Current Funds to Title Company, for a total of Two Hundred Thousand Dollars ($200,000.00) in Earnest Money Deposit to be held by the Title Company in escrow to be applied or disposed of by the Title Company as is provided in this Contract. As used in this Contract, the term **"Current Funds"** shall mean wire transfers, certified funds or a cashier's check in a form acceptable to the Title Company that would permit the Title Company to immediately disburse such funds.

3.2     Application and Interest.  If the purchase and sale hereunder is consummated, then the Earnest Money Deposit shall be applied to the Purchase Price at Closing to reduce the amount required under Section 8.2(b)(i) hereof. In all other events, the Earnest Money Deposit shall be disposed of by the Title Company as provided in this Contract. If agreed to by the parties, the Title Company shall invest the Earnest Money Deposit in a federally insured interest-bearing account for the benefit of Purchaser at a bank deemed appropriate by the Title Company. All interest earned on the Earnest Money Deposit is part of the Earnest Money Deposit, to be applied or disposed of in the same manner as the Earnest Money Deposit under this Contract.

3.3     Demand for Earnest Money Deposit.  Except for a termination of this Contract by Purchaser during the Inspection Period (with respect to which the provisions of Section 5.2 apply) or as permitted under this Contract, if for any reason the Closing does not occur and either party makes a written demand upon the Title Company for payment of the Earnest Money Deposit, the Title Company shall give written notice to the other party of such demand.  If the

Title Company does not receive a written objection from the other party to the proposed payment within five (5) business days after the giving of such notice, the Title Company is hereby authorized to make such payment. If the Title Company does receive such written objection within such five (5) business day period or if for any other reason the Title Company in good faith shall elect not to make such payment, the Title Company shall continue to hold such amount until otherwise directed by written instructions from both parties to this Contract or a final judgment of a court of competent jurisdiction which is not subject to further appeal. The parties acknowledge that the Title Company is acting solely as a stakeholder at their request and for their convenience, that the Title Company shall not be deemed to be the agent of either of the parties, except as expressly set forth herein, and that the Title Company shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Contract or of any escrow agreement or involving gross negligence. The Title Company joins in the execution of this Contract solely for the purpose of acknowledging receipt of the Earnest Money Deposit and its agreement to hold the same pursuant to the terms hereof.

## ARTICLE IV.

## TITLE AND SURVEY

4.1     Title. Seller shall deliver (or cause the Title Company to deliver) to Purchaser copies of the following that are in Seller's current possession or control: (a) any lender's or owner's policies of title insurance or commitments, whether in the name of Seller or their predecessors in interest (the "**Title Policy**") for the Property, and (b) instruments, documents or agreements referenced in the Title Policy (the "**Exception Documents**"), and (c) any surveys of the Property (the "**Existing Surveys**"). Purchaser may order an update of the Existing Surveys ("**Updated Survey**") and a Commitment of the Title Company to issue an Owner's Title Policy (referred to hereinafter as the "**Title Commitment**") for the Property, naming Purchaser as the named insured in the amount of the Purchase Price. Purchaser shall have until the end of the later of: (i) ten (10) Business Days after receipt of the Title Commitment and Updated Survey; and (ii) the Inspection Period to review and approve or disapprove the Title Policy, Title Commitment, Exception Documents and the Updated Survey. If Purchaser has any objections to the matters set forth in the Title Commitment, Title Policy, Exception Documents or the Updated Survey, Purchaser shall notify Seller in writing ("**Title Objection Notice**"). Within five (5) days after receipt of the Title Objection Notice Seller shall notify Purchaser whether or not Seller shall, at its option, resolve any such objections; provided, that if Seller indicates it will not resolve any objection, Seller shall have no obligation to cure any such objection. If Purchaser fails to provide Seller written objections pursuant to its rights by the date specified in this Section 4.1, then Purchaser shall be deemed to have acknowledged to Seller that Purchaser has no objections to the matters set forth in the Title Policy, the Title Commitment, the Exception Documents or the Updated Survey, and will accept title to the Property in the form described in Section 4.2 hereof. If Purchaser provides Seller with written objections to the Title Policy, the Title Commitment, Exception Documents or Updated Survey on or before the date specified above, and Seller does not agree, in writing, delivered to Purchaser within ten (10) business days of the Title Objection Notice, or if, upon agreement to cure Seller fails to do so on or before Closing, Purchaser may terminate this Contract by providing written notice to Seller by the later of (i) ten (10) days after receipt of Seller's notice or the expiration of the Inspection Period, in

-3-

which event neither party shall have any further rights, duties or obligations hereunder (except with respect to provisions of this Contract which expressly survive the termination of this Contract) and the Earnest Money Deposit shall be returned and delivered to Purchaser. If Purchaser does not terminate this Contract pursuant to its rights under this Section 4.1 or under Section 5.2 on or before the end of the Inspection Period, then Purchaser shall be deemed to have acknowledged to Seller that Purchaser will accept title to the Property in accordance with the provisions of Section 4.2 below. Notwithstanding the foregoing, Purchaser shall not be required to object to and Seller will in all events pay off any monetary liens against the Property, which may be paid from the proceeds payable to Seller at Closing and Seller shall provide such affidavits and documentation required by the Title Company to delete the "standard exceptions" to title. Notwithstanding anything to the contrary herein, Seller makes no representations to Purchaser that the Title Company may delete "standard exceptions".

4.2     Status of Title at Closing. It shall be a condition to Purchaser's obligations hereunder that at Closing title to the Property shall be subject to only the following exceptions, as applicable ("**Permitted Exceptions**"):

(a)     Building, zoning and subdivision laws and ordinances, and local, state and federal laws, rules and regulations;

(b)     The exceptions to title listed in the Title Commitment and the Exception Documents, except those Seller has agreed in this Contract or in writing, as provided in Section 4.1 above, to cure prior to Closing;

(c)     Any title exceptions arising out of the acts of Purchaser;

(d)     Any and all easements, rights-of-way, buildings, improvements and other matters shown on the Existing Surveys except those Seller has agreed in this Contract or in writing, as provided in Section 4.1 above, to cure prior to Closing; and

(f)     Taxes and assessments encumbering the Property not yet due or payable.

**ARTICLE V.**

**INSPECTION BY PURCHASER**

5.1     Inspection Rights. Purchaser shall have a period of time commencing on the Effective Date and expiring at 5:00 p.m., Eastern Daylight Time, on the thirtieth (30th) day following the Effective Date (the "**Inspection Period**"), and thereafter until Closing or earlier termination of this Contract, within which to examine the Title Policy, Title Commitment, Exception Documents, Existing Surveys, Submission Matters (as defined below), other documents and other items and the Property (collectively, the "Due Diligence Items") and conduct its feasibility study thereof. Seller must deliver the Due Diligence Items or provide access to same on the Effective Date or promptly thereafter. Notwithstanding the foregoing, (a) Purchaser shall not permit any construction, mechanic's or materialman's liens or any other liens to attach to the Property or any portion thereof by reason of the performance of any work or the purchase of any materials by Purchaser or any other party in connection with any studies or tests conducted pursuant to this Section 5.1; and (b) Purchaser shall give not less than one (1) business

days notice (which may be by telephone or email) to Seller prior to entry onto the Property and shall permit Seller to have a representative present during all investigations and inspections conducted with respect to the Property; provided however, if Seller's inspector is unavailable the inspection shall proceed without them. Purchaser shall indemnify, defend and hold Seller harmless for, from and against any and all claims, liabilities, causes of action, actual, out-of-pocket damages, liens, losses and expenses (including, without limitation, reasonable attorneys' fees and costs) resulting from any of Purchaser's or its agents', contractors' or representatives' activities on the Property or from Purchaser's breach of its obligations or agreements under this Article V. Purchaser's indemnity obligations contained in this Section 5.1 shall survive the Closing and not be merged therein and shall also survive any termination of this Contract; provided however, in no event shall Purchaser be liable to the extent of the negligence of Seller, its employees, agents or contractors.

5.2     Approval of Inspections.  If Purchaser determines at any time prior to the expiration of the Inspection Period that the Property is not satisfactory to Purchaser for any reason or for no reason whatsoever in Purchaser's sole and absolute discretion, then Purchaser may terminate this Contract by delivering written notice of termination to Seller prior to the end of such Inspection Period. If Purchaser properly terminates this Contract pursuant to this Section 5.2, then this Contract shall be terminated, the Title Company shall return the Earnest Money Deposit to Purchaser upon the unilateral direction of Purchaser and notwithstanding any contrary direction from Seller, and neither party shall have any further rights, duties or obligations hereunder except with respect to the provisions of this Contract which expressly survive the termination of this Contract. If Purchaser does not timely deliver to Seller written notice of termination during the Inspection Period, the conditions of this Section 5.2 shall not be deemed satisfied, and Purchaser shall be deemed to terminate this Contract pursuant to this Section 5.2.

5.3     Matters Delivered by Seller.  Within five (5) business days after the Effective Date, and each day that Seller does not deliver such Submission Materials shall extend the Inspection Period on a day by day basis, Seller shall deliver to Purchaser copies of the documents on Schedule 5.3 to this Contract (collectively, the "**Submission Matters**"), to the extent they exist and are in Seller's possession or control.

**ARTICLE VI.**

**REPRESENTATIONS AND WARRANTIES; DISCLAIMERS AND WAIVERS**

6.1     Representations and Warranties of Purchaser.  Purchaser represents and warrants to Seller as of the Effective Date and as of the Closing Date, as applicable, that (a) Purchaser is a limited liability company, duly organized and validly existing under the laws of the State of Delaware; (b) the Property is being acquired by Purchaser for investment purposes only, for its own account, and not with a view to distributing, reselling, pledging, or otherwise disposing of the Property; (c) this Contract constitutes a valid and legally binding obligation of Purchaser, enforceable in accordance with its terms; (d) as of the Closing Date, Purchaser has had an opportunity to ask the representatives of Seller any and all questions it has about the Property; and (d) Purchaser has the requisite knowledge and experience in real estate, finance, and investments generally so that Purchaser is able to evaluate the merits and risks of the investment in the Property.

-5-

6.2 <u>Representations and Warranties of Seller</u>. Seller hereby represents and warrants to Purchaser as of the Effective Date and as of the Closing Date as applicable:

(a) Seller is a duly organized and validly existing limited liability company under the laws of the State of Indiana.

(b) Seller has the full right, power and authority to sell and convey the Property to Purchaser as provided in this Contract and to carry out Seller's respective obligations hereunder. All requisite action necessary to authorize Seller to enter into this Contract and perform their obligations hereunder has been taken. The joinder of no person or entity other than Seller will be necessary to convey the Property fully and completely to Purchaser upon Closing. This Contract is a valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms. The individual executing this Contract on Seller's behalf has been duly authorized and empowered to bind Seller to this Contract;

(c) This Contract constitutes a valid and legally binding obligation of Seller, enforceable in accordance with its terms;

(d) The Submission Matters furnished by Seller to Purchaser are true, complete and correct copies of the documents they purport to represent;

(e) Except as otherwise shown in the Submission Matters and the Permitted Exceptions, Seller has not received written notice that any condemnation proceedings, eminent domain proceedings or similar actions or proceedings are now pending or, to Seller's actual knowledge, threatened against the Property;

(f) Seller is not insolvent and is able to pay its debts as they mature and no proceeding in bankruptcy or for the appointment of any receiver for all or any portion of Seller's property, real or personal, has been filed by or against Seller in any federal or state court and there are no federal or state tax liens against Seller or the Property;

(h) There is no litigation pending or, to the best of Seller's knowledge, threatened against Seller or the Property;

(i) the execution of this Contract and the consummation of the transaction contemplated herein do not and will not violate the terms of any agreement or court order which is binding upon Seller or Property.

(j) Seller has received no notice that the Property or Seller are in violation of any of the applicable requirements of law in connection with the disposal, storage, treatment, generation, processing and other handling of waste and the emission or discharge of any effluent, contaminants, pollution or other materials, and no other person or entity has used all or part of the Property or any lands contiguous to the Property in violation of any of those requirements of law.

-6-

(l)     Except as disclosed to Purchaser, to the best of Seller's knowledge, there are no management, employment, service, equipment, supply, maintenance, water, sewer, or other utility or concession   agreements or agreements with municipalities (including improvement or development escrows or bonds) with respect to or affecting the Property which will burden the Property or Purchaser after Closing in any manner whatsoever, except for instruments of record.

(m)     No party has any right or option to acquire or lease the Property or any portion thereof.

(o)     If, during the period between the Effective Date and the Closing Date or earlier termination hereof, any event occurs or condition exists which renders any of the representations contained herein untrue or misleading in any material respect, Seller shall promptly (within the earlier of the expiration of the Inspection Period or three (3) days) notify Purchaser.

(p)     From the date hereof through Closing, Seller shall operate the Property in accordance with the prudent and customary management practices for properties of this type and in compliance with the provisions of this Agreement.   Seller will maintain, or will cause Tenant to maintain, in effect through Closing the insurance presently maintained on the Property.

(q)     Seller has no knowledge of any violations nor has Seller received notices of violations affecting the Property (including without limitation, violations or notices of violations with respect to the Americans With Disabilities Act or any lead paint regulations) and Seller has not received any notification from any governmental agency requiring any repairs, replacements or alterations to the Property.

(r)     The Seller is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate" as those terms are defined in Section 1445 of the Internal Revenue Code.

(s)     There is no assessment presently outstanding or unpaid for local improvements or otherwise which has or may become a lien against any Property. Further, Seller knows of no public improvements which have been ordered to be made and/or which have not heretofore been completed, assessed and paid for.

(t)     In the event any claim is made by any party for the payment of any amount due for the furnishing of labor and/or materials to the Property or the Seller prior to Closing, or in the event any lien is filed against the Property subsequent to Closing as a result of the furnishing of such materials and/or labor prior to Closing, Seller shall immediately pay said claim and discharge said lien.

(u)     Neither Seller nor any of its constituent partners, members or shareholders have engaged in any dealings or transactions, directly or indirectly, (a) in contravention of any U.S., international or other money laundering regulations or conventions,

-7-

including, without limitation, the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986, the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, Trading with the Enemy Act (50 U.S.C. § 1 et seq., as amended), or any foreign asset control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, or (b) in contravention of Executive Order No. 13224 dated September 24, 2001 issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), as may be amended or supplemented from time to time ("Anti-Terrorism Order") or on behalf of terrorists or terrorist organizations, including those persons or entities that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Organization of Economic Cooperation and Development, Financial Action Task Force, U.S. Office of Foreign Assets Control, U.S. Securities & Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, U.S. Internal Revenue Service, or any country or organization, all as may be amended from time to time. Neither Seller nor any of its constituent partners, members or shareholders (i) are or will be conducting any business or engaging in any transaction with any person appearing on the U.S. Treasury Department's Office of Foreign Assets Control list of restrictions and prohibited persons, or (ii) are a person described in section 1 of the Anti-Terrorism Order, and to the best of Seller's knowledge, neither Seller nor any of its affiliates have engaged in any dealings or transactions, or otherwise been associated with any such person. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

6.3 NO ADDITIONAL REPRESENTATIONS OR WARRANTIES OF SELLER. PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SPECIFIED IN THIS CONTRACT OR IN THE CLOSING DOCUMENTS, SELLER HAS NOT MADE, AND SELLER HEREBY SPECIFICALLY DISCLAIMS, ANY REPRESENTATION OR WARRANTY OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO HABITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITION, UTILITIES, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, OR ANY OTHER MATTER OR THING REGARDING THE LAND OR IMPROVEMENTS. PURCHASER AGREES TO ACCEPT THE PROPERTY AND ACKNOWLEDGES THAT THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE BY SELLER ON AN "AS IS, WHERE IS, AND WITH ALL FAULTS" BASIS. PURCHASER IS AN EXPERIENCED PURCHASER OF PROPERTIES SUCH AS THE PROPERTY AND PURCHASER HAS MADE OR WILL MAKE PURCHASER'S OWN INDEPENDENT INVESTIGATION OF THE PROPERTY. THE PROVISIONS OF THIS SECTION 6.3 SHALL SURVIVE THE CLOSING HEREUNDER.

6.4 Survival of Representations and Warranties. The representations and warranties of Seller and Purchaser set forth in this Article VI shall survive the Closing for a period of

eighteen (18) months subsequent to Closing, and any action brought upon a claim by Purchaser or Seller against the other party for breach of any representation or warranty contained in this Article VI must be brought, if at all, within eighteen (18) months after Closing or such claim and action shall be forever barred.

6.5    Covenants of Seller. At all times prior to Closing Seller shall:

(a)    Refrain from transferring any of the Property or creating on the Property any easements, liens, mortgages, encumbrances or other interests which would affect the Property or Seller's ability to comply with the terms of this Agreement;

(b)    Refrain from entering into any contracts or other commitments regarding the Property, other than in the ordinary and usual course of business, which may be cancelled at Closing without penalty, and which shall be cancelled by Sellers, as applicable, at Closing, without the prior written consent of Purchaser;

(c)    Refrain from entering into any leases without Purchaser's prior written consent;

(d)    Keep in effect Sellers' existing policies of insurance insuring the Property; and

(e)    Refrain from marketing the Property for sale any listings from any websites. Seller shall not negotiate any other offers to sell or lease the Property.

## ARTICLE VII.

## CONDITIONS PRECEDENT TO PURCHASER'S AND SELLER'S PERFORMANCE

7.1    Conditions to Purchaser's Obligations.  Purchaser's obligation under this Contract to purchase the Property is subject to the fulfillment of each of the following conditions (any or all of which may be waived by Purchaser):

(a)    the representations and warranties of Seller contained herein shall be true, accurate and correct in all material respects as of the Closing Date;

(b)    Seller shall have performed all of its obligations required to be performed by Seller under this Agreement, as and when required by this Agreement;

(c)    Seller shall have delivered all the documents and other items required pursuant to Section 8.2(a), and shall have performed, in all material respects, all other covenants, undertakings and obligations, and complied with all conditions required by this Contract to be performed or complied with by Seller at or prior to the Closing;

(d)    between the date of this Contract and the Closing, there shall have been no intervening destruction or damage to or condemnation of the Property or any portion thereof or any material change in the physical condition thereof or the financial condition of the tenant thereof;

(e)     title to the Property shall be subject only to the applicable Permitted Exceptions, as defined in Section 4.2 hereof;

(f)     The Seller and Purchaser shall have entered into a new mutually acceptable written Lease (the "Lease") pursuant to which Purchaser shall lease the Property from Seller, which such Lease shall contain the following terms and conditions, unless otherwise mutually agreed to by Seller and Purchaser in the definitive Lease: (a) a term equal to twenty-three (23) years, (b) annual rent starting at $400,000 with 2% increases every lease year, (c) commencement date at Closing, (d) absolute or pure, triple net terms as a "bondable" lease, and (e) full corporate guaranty fom CJ Dalstop Holding AB or the principal parent for the first year of the lease term (provided that there is no default) and thereafter from CJ Automotive North America LLC; and

(g)     the Title Company must be willing to issue an owner's title policy to the Purchaser showing no exceptions other than the Permitted Exceptions and the "standard Exceptions".

7.2     <u>Conditions to Seller's Obligations</u>.  Seller's obligation under this Contract to sell the Property to Purchaser is subject to the fulfillment of each of the following conditions (any or all of which may be waived by Seller):

(a)     the representations and warranties of Purchaser contained herein shall be true, accurate and correct in all material respects as of the Closing Date; and

(b)     Purchaser shall have delivered the total Purchase Price, and other funds required hereunder and all the documents and other items required pursuant to Section 8.2(b).

## ARTICLE VIII.

## CLOSING

8.1     <u>Closing Date</u>.

(a)     <u>Time and Place</u>.  Provided the terms and conditions set forth in this Contract have been fulfilled, the consummation of the purchase and sale of the Property (the **"Closing"**) shall take place by delivery of documents to the office of the Title Company, on or about the fifteenth (15th) day following the expiration of the Inspection Period (the **"Closing Date"**), or such time and place as the parties may mutually agree upon in writing. Purchaser shall have the option to extend the Closing Date by fifteen (15) days by delivering an additional Fifty Thousand Dollars ($50,000.00) in Current Funds to the Title Company and thereby increasing the Earnest Money Deposit to Two Hundred Fifty Thousand Dollars ($250,000.00).

(b)     <u>Delivery of Documents in Escrow; Title Insurance</u>.  The documents required hereunder to be delivered at Closing shall be delivered by Seller and Purchaser into escrow with the Title Company, which shall record and/or deliver all documents deposited into escrow hereunder upon payment of the Purchase Price to the Title

Company and shall remit the Purchase Price to Seller simultaneously with the recordation and/or delivery of all documents deposited into escrow hereunder and simultaneously with the issuance of the title policy in the form required in this Agreement.

8.2     Items to be Delivered at the Closing.

(a)     Seller.  At the Closing, Seller shall deliver, or cause to be delivered, to Purchaser each of the following items with respect to each Property:

(i)     the Lease, duly executed by Seller and all Lease guaranties;

(ii)     A Covenant or Special Warranty Deed for the Land, Improvements and Appurtenances, duly executed by Seller;

(iii)     A warranty Bill of Sale for the Personal Property;

(iv)     Non-Foreign Affidavit for Seller for purposes of compliance with Section 1445 (b)(2) of the Internal Revenue Code of 1986, as amended, and the regulations adopted thereunder;

(v)     A blanket bill of sale and assignment conveying to Purchaser the Contracts, Permits, Warranties and Plans;

(vi)     A certificate of Seller evidencing that the person or persons executing this Contract and the Closing documents on behalf of Seller have full right, power and authority to do so, and attaching appropriate resolutions authorizing this Contract and the transactions contemplated hereunder;

(vii)     A Certificate of Existence of Seller, as issued by the Secretary of the State of Indiana;

(viii)     a 1099 form;

(ix)     In the event that this is a sale of substantially all the assets of Seller or the Indiana bulk sales law shall be applicable, bulk sales clearance from the State of Indiana; and

(x)     Other items reasonably requested by the Title Company for the sale of the Property in accordance with this Contract or for administrative requirements for consummating the Closing, including, without limitation, a "no change affidavit" with respect to the existing survey and an owner's affidavit with respect to the deletion of the "standard exceptions".

(b)     Purchaser.  At the Closing, Purchaser shall deliver or cause to be delivered, to Seller or perform, as applicable, each of the following items with respect to each Property:

(i)     The total Purchase Price in Current Funds plus or minus

prorations;

     (ii)    Such additional funds in cash or Current Funds, as may be necessary to cover Purchaser's share of the Closing costs and prorations hereunder;

     (iii)    The Lease, dated as of the Closing Date, duly executed by Purchaser;

     (iv)    If the Purchaser is corporation, partnership or other entity, a certificate from an officer of Purchaser, or the general partner of Purchaser, evidencing that the person or persons executing this Contract and the Closing documents on behalf of Purchaser have full right, power and authority to do so, and attaching the articles of incorporation and bylaws (or other appropriate organizational documents) of Purchaser and appropriate resolutions authorizing this Contract and the transactions contemplated hereunder;

     (v)    All documents reasonably required for the Seller Financing, duly executed by Purchaser; and,

     (vi)    Other items reasonably requested by the Title Company for the sale of the Property in accordance with this Contract or for administrative requirements for consummating the Closing.

     8.3    <u>Costs of Closing</u>. Purchaser shall pay for the following costs and expenses related to the transfer of the Property: (i) all costs and expenses incurred by Purchaser in connection with its due diligence investigation of the Property; (ii) all premiums charged by the Title Company for any endorsements or extended coverage to the new Owner's Title Policy except any Lender's Policy; (iii) one-half of escrow fees charged by Title Company; (iv) recording fees incurred in connection with this transaction. Seller agrees to pay: (a) one-half of escrow fees charged by Title Company, (b) all search and exam fees and all premiums charged by the Title Company for the base new Owner's Title Policy and and (c) transfer taxes and other governmental taxes incurred in connection with this transaction. Each party shall pay its own legal fees and advisory fees incidental to the execution of this Contract and the consummation of the transactions contemplated herein. Any other costs or expenses shall be allocated in accordance with local custom. The provisions of this Section 8.3 shall survive the Closing or earlier termination of this Contract.

     8.4    <u>Prorations</u>. There shall be proration of taxes, utility expenses and all items usually prorated in transactions of the type described herein. Seller shall cause utility readings as close to Closing as possible. In addition, the tenant shall pay the first month's rent and security deposit under the terms of the Lease at Closing. The provisions of this Section 8.4 shall survive the Closing.

# ARTICLE IX.

## CONDEMNATION OR CASUALTY

9.1     Condemnation. In the event that all or any portion of the Property is condemned or taken by eminent domain or conveyed by deed in lieu thereof, or if any condemnation proceeding is threatened or commenced for all or any portion of the Property prior to Closing, Purchaser may elect to terminate this Contract by written notice thereof to Seller within ten (10) days after Purchaser is notified of the condemnation, taking or deed in lieu or institution of such condemnation proceeding.  Upon termination of this Contract as to the Condemned Property as provided in this Section 9.1, all rights, duties and obligations hereunder shall cease and be of no further force or effect (except with respect to the provisions hereof which expressly survive the termination of this Contract), and the Earnest Money Deposit shall be returned to Purchaser. If Purchaser does not terminate this Contract as aforesaid, then both parties shall proceed to close the transaction contemplated herein pursuant to the terms hereof, in which event Purchaser shall be assigned all rights to receive any condemnation proceeds with respect to such condemnation or taking and there shall be no reduction in the Purchase Price.

9.2     Casualty. In the event that any portion of the Property shall be damaged or destroyed by fire or other casualty prior to Closing, Purchaser may terminate this Contract by written notice thereof to Seller within ten (10) days after Purchaser is notified of the casualty. Upon termination of this Contract as provided in this Section 9.2, all rights, duties and obligations hereunder shall cease and be of no further force or effect (except with respect to the provisions hereof which expressly survive the termination of this Contract), and the Earnest Money Deposit shall be returned to Purchaser.  If Purchaser does not terminate this Contract as aforesaid, then both parties shall proceed to close the transaction contemplated herein pursuant to the terms hereof, in which event Purchaser shall be assigned all rights to receive any insurance proceeds with respect to such casualty and  there shall be no reduction in the Purchase Price except that Purchaser shall receive a credit for any deductible.

# ARTICLE X.

## DEFAULTS AND REMEDIES

10.1     Default by Purchaser.  If Seller shall not be in default hereunder and Purchaser refuses or fails to consummate the Closing under this Contract for reasons other than as expressly set forth in Section 5.2 or Article IX hereof or other than due to a failure of a condition precedent to Purchaser's obligation to close as set forth in Section 7.1 hereof (provided that if the failure of such condition precedent is caused by Purchaser's breach of or default under this Contract, Purchaser shall nonetheless be obligated to proceed with Closing notwithstanding the failure of such condition precedent), after the expiration of ten (10) days after notice from Seller during which Purchaser shall have the right to cure such default, Seller may, as their sole and exclusive remedy, terminate this Contract in which event the Title Company shall pay the Earnest Money Deposit to Seller and Seller shall be entitled to receive and retain the Earnest Money Deposit as liquidated damages (Seller and Purchaser hereby acknowledging that the amount of damages in the event of Purchaser's default is difficult or impossible to ascertain but that such amount is a fair estimate of such damages), and neither party shall have any further

rights, duties, or obligations hereunder except with respect to the provisions hereof which expressly survive the termination of this Contract.

10.2 <u>Default by Seller</u>. If Purchaser shall not be in default hereunder and if Seller refuse or fail to consummate the Closing under this Contract other than due to a termination permitted under this Contract or a failure of a condition precedent to Seller's obligation to close as set forth in Section 7.2 hereof, after the expiration of ten (10) days after notice from Purchaser during which Seller shall have the right to cure such default, Purchaser may, at Purchaser's sole option and as its sole and exclusive remedies, either (a) terminate this Contract in consideration of liquidated damages paid by Seller to Purchaser in the amount of Seventy-Five Thousand Dollars ($75,000) and neither party shall have any further rights, duties or obligations hereunder except with respect to the provisions of this Contract which expressly survive the termination hereof, and Purchaser shall be entitled to a refund of the Earnest Money Deposit, or (b) enforce specific performance of this Contract against Seller. Seller shall not be liable to Purchaser for any damages, including, without limitation, any actual, punitive, speculative or consequential damages or damages for loss of opportunity or lost profit.

10.3 <u>Attorneys' Fees</u>. If it shall be necessary for either Purchaser or Seller to employ an attorney to enforce its rights pursuant to this Contract, the non-prevailing party shall reimburse the prevailing party for its reasonable attorneys' fees. The provisions of this Section 10.3 shall survive the Closing or termination of this Contract.

## ARTICLE XI.

## BROKERAGE COMMISSIONS

11.1 <u>Brokerage Commission</u>. Provided that the transaction contempated herein closes and the Purchase Price has been paid, IKON Investments ("**IKON**") shall receive a Commission equal to six percent (6%) of the Purchase Price from Seller, which is due at Closing. Purchaser and Seller each agree to indemnify, defend and hold the other harmless for, from and against any and all loss, liability, damage, cost or expense (including, without limitation, reasonable attorneys' fees) arising out of or paid or incurred by such party by reason of any claim to any broker's, finder's or other fee in connection with this transaction by any party claiming by, through or under such party other than IKON. The indemnity obligations set forth in this Section 11.1 shall survive the Closing or the termination of this Contract.

## ARTICLE XII.
## NO ASSUMPTION OF LIABILITIES

The parties acknowledge that this transaction contemplates only the sale and purchase of the Property and that Seller is not selling a business nor do the parties intend that Purchaser be deemed a successor of Seller with respect to any liabilities of Seller to any third party. Except for the foregoing, Purchaser shall neither assume nor be liable for any of the debts, liabilities, taxes or obligations of, or claims against, Seller, or of any other person or entity, of any kind or nature, whether existing now, on the Closing or at any time thereafter. All of such debts, liabilities, taxes, obligations and claims shall be solely those of Seller, and Seller hereby represents, warrants, covenants and agrees to defend, indemnify and hold harmless Purchaser

from any liability with respect thereto. The debts, liabilities, taxes, obligations and claims for which Seller alone is liable shall include, without limitation (a) all payments and benefits to past and/or present employees of any of the Seller in connection with the business being conducted on or from the Property as may have accrued through the Closing (including, but not limited to, salaries, wages, commissions, bonuses, vacation pay, health and welfare contributions, pensions, profit sharing, severance or termination pay, or any other form of compensation or fringe benefit); (b) obligations of Seller under any Contracts prior to the Closing; (c) all liabilities of any kind whatsoever in connection with the operation of the Property prior to the Closing; and (d) the breach of any representation or warranty made hereunder by Seller.

Purchaser shall be fully responsible for and shall indemnify and hold Seller harmless with respect to: (a) the operation of the Property on and after the Closing Date; and the breach of Purchaser's representations or warranties under this Agreement.

This Article XII shall survive the Closing and not be merged therein and shall also survive any termination of this Contract.

## ARTICLE XIII.

## MISCELLANEOUS

13.1     Notices.  Any notice provided or permitted to be given under this Contract must be in writing and may be served by depositing the same in the United States Mail, postage prepaid, certified or registered mail with return receipt requested, or by delivering the same in person to the party to be notified via a delivery service, Federal Express or any other nationally recognized overnight courier service that provides a return receipt showing the date of actual delivery of same to the addressee thereof, or by facsimile or email copy transmission with proof of receipt.  Any party giving notice hereunder shall use reasonable efforts to send a copy of any such notice by facsimile or email transmission on the same date as deposited in the mail or given to such delivery service.  Notice given in accordance herewith shall be deemed given and shall be effective upon the earlier of actual receipt (including, without limitation, receipt of a facsimile transmission) or refusal of delivery.  For purposes of notice, the addresses of the parties shall be as follows:

Seller:             CJ Automotive Indiana, LLC
                    Attention: Raymond Bomya
                    100 Commerce Street
                    Butler, IN 46721
                    Ray.Bomya@cjautomotive.com

Copy:               Paesano Akkashian Apkarian PC
                    Attention: Anthony R. Paesano
                    7457 Franklin Road, Ste 200
                    Bloomfield Hills, MI 48301
                    Phone: (248) 952-9400

-15-

apaesano@paalawfirm.com

| | |
|---|---|
| Buyer: | Butler Propco LLC<br>c/o Vantage Holdings Group LLC<br>Attention : Jonathan Fine<br>200 Park Avenue, Suite 1700<br>New York, NY 10166<br>Phone : (212) 850-8113<br>jfine@vantageh.com |
| With a mandatory<br>Copy to: | Plunkett Cooney PC<br>Attention: Howard Goldman<br>38505 Woodward, Suite 100<br>Bloomfield Hills, MI 48304<br>hgoldman@plunkettcooney.com |
| Title Company: | Amrock LLC<br>201 West Big Beaver Road, Suite 160<br>Troy, Michigan, 48084-4169<br>Phone: (313) 877-1776<br>BobPowell@Amrock.com |

13.2 GOVERNING LAW. THE LAWS OF THE STATE OF INDIANA SHALL GOVERN THE VALIDITY, CONSTRUCTION, ENFORCEMENT AND INTERPRETATION OF THIS CONTRACT.

13.3 Entirety and Amendments. This Contract embodies the entire agreement between the parties and supersedes all prior agreements and understandings, if any, relating to the transaction described herein, and may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

13.4 Assignment. Purchaser may assign its rights under this Contract to an entity controlling, controlled by, or under common control with Purchaser without the prior written consent of Seller; provided, that any such assignment must be made in a timely manner so as not to adversely affect the timing of Closing; and, provided, further, that Purchaser must promptly provide Seller with a copy of any instrument assigning this Contract. Except as expressly provided in the preceding sentence, this Contract may not be assigned in whole or in part by Purchaser without the prior written consent of Seller, not to be unreasonably withheld, conditioned or delayed. In the event of an assignment of this Contract by Purchaser, Purchaser shall not be released from any liability or obligations hereunder, and Purchaser shall promptly deliver to Seller a copy of the instrument effecting such assignment. Subject to the foregoing, this Contract shall be binding upon and inure to the benefit of Seller and Purchaser and their respective heirs, personal representatives, successors and assigns.

13.5 Survival. Except as otherwise expressly provided herein, no representations, warranties, covenants or agreements contained in this Contract shall survive the termination of

this Contract or the Closing and the assignment of the Property hereunder.

13.6 <u>Multiple Counterparts</u>. To facilitate execution, this Contract may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature or acknowledgment of, or on behalf of, each party, or that the signature of all persons required to bind any party, or the acknowledgment of such party, appear on each counterpart. Facsimile or email copies of a signature of any party shall be deemed the same as the original. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Contract to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, and the respective acknowledgments of, each of the parties hereto. Any signature or acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures or acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature or acknowledgment pages.

13.7 <u>Risk of Loss</u>. Subject to the provisions of Article IX of this Contract, risk of loss or damage to the Improvements, or any part thereof, by fire or any other casualty from the date this Contract is fully executed up to the time of Closing will be on Seller and, thereafter, will be on Purchaser.

13.8 <u>Effective Date</u>. As used herein, the term **"Effective Date"** shall mean for all purposes in this Contract the date on which both Seller and Purchaser have executed a counterpart of this Contract and delivered same to the Title Company. The Title Company shall deliver original counterparts of the Contract to each party within one (1) business day after its receipt of same.

13.9 <u>No Recordation of Contract</u>. In no event shall this Contract or any memorandum hereof be recorded in the public records of the state or county in which any portion of the Land is situated, and any such recordation or attempted recordation shall constitute a breach of this Contract by the party responsible for such recordation or attempted recordation.

13.10 <u>Business Days</u>. All references to "business days" contained herein are references to normal working business days, i.e., Monday through Friday of each calendar week, exclusive of federal and national bank holidays. In the event that any event hereunder is to occur, or a time period is to expire, on a date which is not a business day, such event shall occur or time period shall expire on the next succeeding business day.

13.11 <u>Captions</u>. The captions, headings and arrangements used in this Contract are for convenience only and do not in any way affect, limit, amplify or modify the terms and provisions hereof.

13.12 <u>Number and Gender of Words</u>. Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender shall include each other gender where appropriate.

13.13 <u>Interpretation</u>. No provision of this Contract shall be construed in favor of, or against, any particular party by reason of any presumption with respect to the drafting of this Contract; both parties, being represented by counsel and having fully participated in the

-17-

negotiation of this instrument, hereby agree that this Contract shall not be subject to the principle that a contract would be construed against the party which drafted the same.

13.14 <u>Incorporation of Exhibits</u>. All exhibits attached and referred to in this Contract are hereby incorporated herein as though fully set forth in (and shall be deemed to be a part hereof) this Contract.

13.15 <u>Third-Party Beneficiaries</u>. Nothing in this Contract, express or implied, is intended to confer any rights or remedies upon any person, other than the parties hereto and, subject to the restrictions on assignment herein contained, their respective successors and assigns.

13.16 <u>Faxed or Emailed Signatures</u>. The parties agree that faxed or emailed signatures may be used to expedite the transaction contemplated by this Contract. Each party intends to be bound by its faxed or emailed signature and each is aware that the other will rely on the faxed or emailed signature, and each acknowledges such reliance and waives any defenses to the enforcement of the documents effecting the transaction contemplated by this Contract based on a faxed or emailed signature.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have executed this Contract of Purchase and Sale to be effective as of the Effective Date.

SELLER:

CJ AUTOMOTIVE INDIANA LLC,
an Indiana limited liability company

By: _____

Date: June 25 2021

**PURCHASER:**

BUTLER PROPCO LLC,
a Delaware limited liability company

By: _____

Name: Jonathan Fine

Title: Authorized Signatory

Date: June 25, 2021

## RECEIPT OF INITIAL EARNEST MONEY DEPOSIT
## AND AGREEMENT OF TITLE COMPANY

   Upon receipt, the Title Company agrees to hold the Initial Earnest Money Deposit and the additional Earnest Money Deposit in escrow as escrow agent for the benefit of Seller and Purchasers and to dispose of same in strict accordance with the terms and provisions of this Contract.

---

AMROCK LLC

By: _____

Date: June ____, 2021

**SCHEDULE 5.3**

**Submission Matters**

1.      Consolidated property level monthly financial records and operating statements for the current year 2021 and annually for 2016 – 2020 including capital expenditures, tenant improvements, tax bills, maintenance records.

2.      Any information related to property, school, or real estate tax assessments or appeals.

3.      ~~Copies of all open agreements, contracts, and sub-leases with respect to the Property.~~

4.      Tenant Leases – including amendments, side letters, option exercise letters, pending documents, or any documentation related to any of the Tenant or Sub-Tenant Leases within any of the properties.

5.      A description, and corresponding invoice, of any major capital improfements or material repairs that have been made of the Property within the past 36 months.

6.      Property surveys if in Seller's possession.

7.      Copies of any open City, County, State of Federal violations, cirations or fines.

8.      Copies of all current permits, license, certificates of occupancy and certifications (including lead) for the Property.

9.      Copy of Seller's existing title report.

10.     Copies of any outstanding litigation notices against the Seller in relation to the Property.

11.     Audited financial statements – income and balance sheet – from 2014 to current year.

12.     An itemized schedule detailing all major equipment within the Property and their respective cost.

13.     A copy of any loans collateralized by equipment within the Property.

# EXHIBIT A

For APN/Parcel ID(s):    17-07-11-126-003.000-027 and

PARCEL 1:

A PART OF THE NORTHWEST QUARTER OF SECTION 11, TOWNSHIP 34 NORTH, RANGE 14 EAST, IN SAID COUNTY AND STATE, BOUNDED BY A LINE COMMENCING AT A POINT 437 FEET WEST OF THE NORTHEAST CORNER OF THE EAST HALF OF THE NORTHWEST QUARTER OF SECTION 11, AS AFORESAID; AND RUNNING FROM THENCE SOUTH 1,055 FEET TO THE NORTH BOUNDARY LINE OF THE RIGHT OF WAY OF THE LAKE SHORE AND MICHIGAN SOUTHERN RAILWAY COMPANY (NOW THE NEW YORK CENTRAL RAILROAD COMPANY); THENCE IN A WESTERLY DIRECTION, ALONG THE NORTH BOUNDARY LINE OF SAID TRACT, 459.06 FEET; THENCE NORTH ON A LINE PARALLEL WITH THE EAST BOUNDARY LINE OF SAID TRACT, 1037.02 FEET TO THE NORTH BOUNDARY LINE OF SAID NORTHWEST QUARTER AS AFORESAID; THENCE EAST ALONG THE NORTH BOUNDARY LINE OF SAID NORTHWEST QUARTER 459.06 FEET TO THE PLACE OF BEGINNING.

PARCEL 2:

LOT NUMBERED NINE (9) IN G. T. JOHN'S ADDITION TO THE TOWN, NOW CITY OF BUTLER, DEKALB COUNTY, INDIANA.

PARCEL 3:

COMMENCING AT A POINT ON THE NORTH LINE OF SECTION 11, TOWNSHIP 34 NORTH, RANGE 14 EAST AND ON THE CENTER LINE OF U.S. HIGHWAY #6, THIS POINT BEING 1,413 FEET EAST OF THE NORTHWEST CORNER OF SAID SECTION 11; THENCE SOUTH 00 DEGREES 30 MINUTES WEST 1,023.9 FEET; THENCE SOUTH 87 DEGREES 30 MINUTES EAST 331.8 FEET, THENCE NORTH 1037.02 FEET TO A POINT ON THE NORTH LINE OF SAID SECTION 11, AND THE CENTER LINE OF U.S. #6, THENCE WEST 308 FEET TO THE PLACE OF BEGINNING.

Open.28568.12720.26672592-2

# EXHIBIT B



July 26, 2021

**VIA E-MAIL AND US MAIL**

CJ Automotive Indiana, LLC
100 Commerce Street
Butler, IN 46721
Attention: Raymond Bomya

Re:    100 Commerce Street
       Butler, IN 46721

Dear Mr. Bomya:

Reference is made to that certain Contract of Purchase and Sale ("Agreement") dated June 25, 2021 between CJ Automotive Indiana, LLC, an Indiana limited liability company ("Seller") and Butler Propco LLC, a Delaware limited liability company, or assigns ("Purchaser"). All capitalized terms used herein unless otherwise defined shall have the meaning set forth in the Agreement. This firm represents the Purchaser.

We are in receipt of Commitment for Title Insurance (the "Commitment") issued by First American Title Insurance Company No. C000124452 with an effective date of June 21, 2021 and ALTA/NSPS Land Title Survey ("Survey") Network Reference No. 20200857-003 prepared by Blew & Associates, P.A. We are writing pursuant to Section 4.1 of the Agreement to set forth our objections to the foregoing.

Title Commitment
 Schedule A

      1.  The Commitment will need to be redated as of the date of closing.

      2.  The legal description consists of multiple parcels. We will need a contiguity endorsement for Parcels 1 and 3.

      3.  We need a copy of the plat depicting Parcel 2.

Schedule B-I

      4.  Seller will need to satisfy Exceptions 1-14 and provide a "no change" affidavit so the title company can rely upon the Survey. Seller must satisfy with releases of record the two mortgages and the judgment in favor of Leaders Staffing against Seller.

---

**ATTORNEYS & COUNSELORS AT LAW**

38505 Woodward Ave., Suite 100 • Bloomfield Hills, MI 48304 • T: (248) 901-4000 • F: (248) 901-4040 • plunkettcooney.com

CJ Automotive Indiana, LLC
July 26, 2021

5. Any real estate taxes becoming due and payable (including the delinquent taxes) prior to Closing must be paid by Seller.

Schedule B-II

6. Seller must delete the general exceptions 1-5.

7. Exception 6 must be revised to state: "Real estate taxes for 2021, a lien not yet due and payable."

8. Exception 8 is a blanket easement and we will need an endorsement against damage to the improvements on the property as a result of this easement.

9. Exception 9 needs to be deleted the rights set forth in the document were exercisable only until May 17, 1951.

10. Exceptions 10-18 must be deleted.

11. Regarding Exception 13 there will be a lease executed at closing with CJ Automotive USA, Inc. The exception should be revised to read: "Rights of CJ Automotive USA, Inc. pursuant to a certain unrecorded Commercial Lease Agreement dated _____, 2021."

Please forward a pro forma title policy at your earliest convenience. Please note that we will also require the following endorsements: access (for all 3 Parcels), tax parcel, same as survey, mineral rights, owner's comprehensive, contiguity, no wet signature, location, environmental lien and deletion of arbitration.

Please let me know if you have any questions or comments.

Sincerely,

Howard B. Goldman
Direct Dial: (248) 433-2310
Email: hgoldman@plunkettcooney.com

HBG/nw
Encl.
cc:     Jonathan Fine
        Anthony R. Paesano, Esq.
        Robert S. Powell

# EXHIBIT C

# FIRST AMENDMENT TO
## CONTRACT OF PURCHASE AND SALE

THIS FIRST AMENDMENT TO CONTRACT OF PURCHASE AND SALE (the "First Amendment") is entered into as of the 26th day of July, 2021, by and between CJ Automotive Indiana, LLC, an Indiana limited liability company ("Seller") and Butler Propco LLC, a Delaware limited liability company, or assigns ("Purchaser").

## RECITALS

A.      Seller and Purchaser have entered into a certain Contract of Purchase and Sale (the "Purchase Agreement") with an Effective Date of June 25, 2021, pursuant to which Sellers agreed to sell and Purchaser agreed to purchase certain real property commonly known as 100 Commerce Street, Butler, Indiana (the "Property"); and

B.      Purchaser and Seller now desire to amend the Purchase Agreement in accordance with the terms and conditions of this First Amendment.

NOW, THEREFORE, in consideration of the promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Incorporation of Recitals/Defined Terms.   The foregoing recitals are hereby incorporated into this First Amendment and made a part hereof by this reference. Capitalized terms used herein and not defined shall have the meanings ascribed to such terms in the Purchase Agreement.

2.      Extension of Inspection Period. Purchaser and Seller hereby agree that the Inspection Period shall now expire on August 6, 2021. Paragraph 5.1 of the Purchase Agreement is hereby amended to delete the words "and expiring at 5:00 p.m., Eastern Daylight Time, on the thirtieth (30th) day following the Effective Date" and replace them with "until August 6, 2021 at 5:00 p.m. Eastern Daylight Time". All references to the Inspection Period shall be deemed to refer to the Inspection Period as extended.

3.      Closing Date. Purchaser and Seller hereby agree that the Closing Date shall now be August 16, 2021. Paragraph 8.1 of the Purchase Agreement is hereby amended to delete the words "on or about the fifteenth (15th) day following the expiration of the Inspection Period" and replace them with "on August 16, 2021". All references to the Closing Date shall be deemed to refer to the Closing Date Period as extended.

4.      Counterparts. This First Amendment may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Amendment.

5.      Signatures. This First Amendment may be executed by either or all parties by facsimile signature or "PDF" signatures emailed, and any such signature shall be deemed to be an original signature.

1

6. Effect of Amendment. In the event of any inconsistencies between this First Amendment and the Purchase Agreement, the terms of this First Amendment shall govern and control. Except as provided herein, all other terms and conditions of the Purchase Agreement shall remain unchanged and the parties hereto ratify the terms and conditions of the Purchase Agreement which remains in full force and effect. This First Amendment may only be amended by a document in writing, executed by the parties hereto.

IN WITNESS WHEREOF, Purchaser and Seller have executed this First Amendment as of the date first written above.

**SELLER:**

CLM LOMOTIVE INDIANA LLC
an Indiana limited liability company

By: _____
Name: _____
Title: _____

**PURCHASER:**

BETTER PROP'CO LLC
a Delaware limited liability company

By: _____
Name: Jonathan Fine
Title: Member

2

# EXHIBIT D

**From:** Ray Bomya <Ray.Bomya@cjautomotive.com>
**Date:** August 13, 2021 at 1:30:37 PM EDT
**To:** Jonathan Fine <jfine@vantageh.com>
**Cc:** James Webb <jwebb@ikonindustrial.com>
**Subject: RE:**


Jonathan,

We reviewed the most recent proposal and our position remains that this is a late change and we do not accept any changes from the agreement and have now missed the possibility to close as agreed on Monday August 16 as previously agreed.

Ray

# EXHIBIT E

Begin forwarded message:

**From:** Jonathan Fine <jfine@vantageh.com>
**Date:** August 16, 2021 at 6:48:00 PM EDT
**To:** Ray Bomya <Ray.Bomya@cjautomotive.com>
**Cc:** hans.trogen@ebitec.se, "Goldman, Howard" <HGoldman@plunkettcooney.com>,
Edward Lee <edward.lee@ikoninvestments.com>, James Webb
<jwebb@ikonindustrial.com>, Lenny <LD@vantageh.com>, Asset Management
<am@vantageh.com>, Anthony Paesano <apaesano@paalawfirm.com>
**Subject: CJ Automotive - Closing Sale Leaseback**

Ray,

It was great speaking with you earlier. As we discussed, our side was prepared to close
today and would like to ensure that a closing happens as soon as possible.

We can close under the current terms however, leaving the roof as is will only cost us
both more in the long run. The roof was always an item of concern given the clear signs
of water damage and cracking underneath the gravel. However current labor shortages
made it difficult to have a roofer come to Butler for a thorough inspection as quickly as
we would have liked. Even the Property Condition Report you provided us from 7/20
(attached) recommends over $500k in roof replacement costs by 2022 and an additional
$233k in short term repairs. If you think refinancing this property with a traditional
mortgage is a simpler route, please keep in mind that a lender will not be as flexible as
us when it comes to brick and mortar issues. Pursuing a mortgage will require you to
once again go through the long process of new property condition and environmental
reports – which the lender will absolutely require you to bear the cost of. As soon as
they see this in a property condition report they may either hold back these proceeds or
require you to regularly escrow money into reserves in order to account for future
repairs/replacements. I do not know of a bank that would ignore such a large line item
in a property condition report.

As this quote from Landmark Roofing states, you can do temporary patch work but
these fixes will become increasingly costly and common given that the underlying
membrane is well beyond its useful life.

[cid:image001.png@01D792CC.9C89F6F0]

1

Closing under the current conditions may cost CJ more over the long term given that you are responsible for structural upkeep and maintenance over the course of the lease term. Our interest is for CJ to be in the best position possible and we are not insisting upon a $1M roof repair – it seems like this has been lost in translation. This was a quote that was provided to us for a 20 year warranty on a Duro Last roof which is considered the "Ferrari" of roofs – this is admittedly overkill. As we mentioned, another vendor is flying in from NC tomorrow to review the roof in person with a local contractor, Tri-State Roofing. We have been pushing them to bring the cost down to the lowest possible price and by using a cheaper material like silicone with a 15, instead of 20 year warranty, they have indicated that the work can potentially be done for $300k or slightly less. We are willing to pay for this cost ourselves in order to make sure CJ's net take home at closing remains unchanged. In an effort to lower CJ's cash outlay, we can compromise by having this cost reimbursed to us over the next ten years instead of the five we had previously discussed. Assuming we can get this done for $300k, the cost to CJ would not be meaningfully different – most likely lower – from indefinite, temporary patch work over the course of the lease term. By addressing the roof, neither of us will have to worry about this for at least the next two decades. By the end of the day tomorrow I expect to receive a tangible quote. If you think this is unreasonable please propose an alternative solution.

I also want to reemphasize that we are ok with legal issues such as neighboring easements be resolved post-closing in order to make sure that you are accessing liquidity as soon as possible. Our priority has always been to close with you promptly under terms that you feel are fair and reasonable. Your attorney has received all of the applicable closing documents in order to prepare for what could have been closed today. We are ready to wire once the lease has been signed and Tony confirms the settlement statements.


Thank you,

Jonathan Fine | Vantage Holdings
200 Park Avenue, Suite 1700
New York, NY 10166
O: (212) 850-8113
M: (516) 491-0970 | jfine@vantageh.com<mailto:jfine@vantageh.com>


Click to Download

1320000225 Butler IN EPCR ROI.pdf
0 bytes

# EXHIBIT F

**From:** Jonathan Fine <jfine@vantageh.com>
**Date:** August 16, 2021 at 2:23:00 PM EDT
**To:** Ray Bomya <Ray.Bomya@cjautomotive.com>
**Cc:** Edward Lee <edward.lee@ikoninvestments.com>, James Webb <jwebb@ikonindustrial.com>, Lenny <LD@vantageh.com>, "Goldman, Howard" <HGoldman@plunkettcooney.com>, Anthony Paesano <apaesano@paalawfirm.com>
**Subject: RE: Building Sale**


Ok. I am not sure if you saw but on Friday Howard sent over the closing documents and lease for signature. We are serious about getting this done with you and can come to a solution that works for your needs. At this point, a lot can be lost in translation over an email and I think it would be helpful to have a call between by tomorrow at the latest.

**From:** Ray Bomya <Ray.Bomya@cjautomotive.com>
**Sent:** Monday, August 16, 2021 2:13 PM
**To:** Jonathan Fine <jfine@vantageh.com>
**Subject:** Building Sale


Jonathan,

I saw you tried to call. I am booked heavy today with meetings.

We will need a day or so. We are evaluating what our next steps need to be from the Sweden side.

Regards,

Ray

1

# EXHIBIT G

202004893
08/11/2020 09:51:31 AM
RECORDER OF DEKALB CO, IN
KATIE FIRESTONE
RECORDED AS PRESENTED
FEE AMOUNT: 55.00

THE PAYMENT OF THE INDEBTEDNESS EVIDENCED BY THIS INSTRUMENT IS SUBORDINATED TO THE PAYMENT OF THE "SENIOR DEBT" DEFINED AND DESCRIBED IN THE SUBORDINATION AGREEMENT DATED JULY __, 2020, AMONG MERCEDES-BENZ U.S. INTERNATIONAL, INC., FIRST FINANCIAL BANK, FIRST FINANCIAL EQUIPMENT FINANCE, LLC, CJ HOLDINGS NORTH AMERICA, LLC, CJ AUTOMOTIVE INDIANA, LLC, AND CJ AUTOMOTIVE USA, INC., AND REFERENCE IS MADE TO THAT AGREEMENT FOR A FULL STATEMENT OF THE TERMS AND CONDITIONS OF SUCH SUBORDINATION. EACH HOLDER OF THIS INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IS IRREVOCABLY BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

## COMMERCIAL MORTGAGE

### THIS IS A FUTURE ADVANCE MORTGAGE

This mortgage (this "**Mortgage**") is made on July 31, 2020 (the "**Effective Date**"), between CJ AUTOMOTIVE INDIANA, LLC, an Indiana limited liability company ("**Mortgagor**"), of 100 Commerce Street, Butler, Indiana 46721-1367, and Mercedes-Benz U.S. International, Inc. ("**Lender**"), of c/o Burr & Forman LLP, 420 North 20th Street, Suite 3400, Birmingham, Alabama 35203, Attn: Derek F. Meek, on the terms and conditions set forth below.

1. **Definitions.** The following terms shall have the following meanings when used in this Mortgage:

a. "**Leases**" means and includes all leases and rental agreements (including, without limitation, oil and gas leases and any specific leases described in an attachment to this Mortgage), written or unwritten, now or later demising the Property in whole or in any part, and all amendments, modifications, extensions, renewals, substitutions, and replacements.

b. "**Letter Agreement**" means that certain Letter Agreement dated as of July __, 2020 between CJ Automotive Indiana, LLC, for themselves and their applicable affiliates (collectively, the "**Borrower**"), Lender, First Financial Bank, and First Financial Equipment Finance, LLC (the two First Financial entities are collectively called "**First Financial**").

c. "**Obligations**" means the obligation of Borrower (for which Mortgagor agrees to be jointly and severally liable) to repay the Loan, as that term is defined in the Letter Agreement, plus all interest accruing thereon, plus all costs, expenses and reasonable attorney fees that may be made or incurred by Lender in the collection of the Loan and enforcement of this Mortgage.

d. "**Property**" means the premises situated in the State of Indiana described in the attached Exhibit A, together with:

i. all the estate, title, interest, and rights of Mortgagor in the premises and all buildings, improvements, and fixtures of every kind and description now or later placed on the premises;

1

43833443 v1

ii.    all of Mortgagor's interest in all of the rents, profits, and leases of the premises and the tenements, hereditaments, easements, privileges, and appurtenances with respect to the premises, including earlier or later vacated alleys and streets abutting the premises;

iii.    all of Mortgagor's right, title, and interest in any and all awards or payments, including interest, and the right to receive them, that may be made with respect to the premises as a result of (A) the exercise of the right of eminent domain, (B) the alteration of the grade of any street, (C) any loss of or damage to any building or other improvement on the premises, or (D) any other injury to or decrease in the value of the premises; and

iv.    all of Mortgagor's rights, title, and interest in, to, and under all present and future land contracts, sales agreements, or option agreements relating to the premises and the proceeds thereof.

2.    **Grant of mortgage.** Mortgagor mortgages and warrants to Lender and its successors and assigns forever the Property and grants to Lender and its successors and assigns a continuing security interest in the Property to secure the timely repayment and performance of the Obligations, to have and to hold the Property, with all of the tenements, hereditaments, easements, appurtenances, and other rights and privileges belonging or in any manner now or appertaining, for the use and benefit of Lender on the conditions set forth below.

3.    **Future advances.** In the event Lender makes future advances to Borrower pursuant to the Letter Agreement, the future advances, and the interest on them, shall be secured by this Mortgage. Future advances shall not exceed $609,000.

4.    **Covenant to pay obligations.** Mortgagor, itself and/or through Borrower, shall promptly pay and perform all Obligations for which Mortgagor or Borrower is liable or obligated in accordance with the terms. Mortgagor agrees it is jointly and severally liable for the Obligations. Mortgagor acknowledges and agrees that this Mortgage shall not be extinguished and that the priority of this Mortgage shall not be altered in any way until a Mortgage discharge has been executed by Lender and recorded in the proper county.

5.    **Covenant of title.** At the time of the execution and delivery of this Mortgage, Mortgagor is the owner of the Property in fee simple, free of any easements, liens, and encumbrances (other than those easements and other matters of record as of the date of this Mortgage; the rights of the public in any part of the Property used or taken for road purposes; and any other mortgages, liens, or encumbrances to which Lender has consented in writing, hereinafter collectively referred to as "Permitted Encumbrances"), and will forever warrant and defend its title against any and all other claims. The lien created by this Mortgage is and will be kept as a valid lien on the Property, subject only to these Permitted Encumbrances.

6.    **Maintenance of property.** Mortgagor shall at all times preserve and maintain the Property in good repair and working order and condition and shall make all necessary improvements and repairs so the value and efficiency of the Property is at all times maintained and Lender's security is not impaired.

43833443 v2

7.     **Payment of Taxes, Liens, and Insurance.** Mortgagor shall pay when due all taxes, assessments, and governmental charges levied on the Property and all claims, liens, encumbrances, levies, judgments, and charges that are at any time levied, recorded, placed on, or assessed against the Property and shall promptly deliver to Lender receipts evidencing such payment following Lender's written request therefor. However, Mortgagor will not be required to pay any tax, assessment, governmental charge, claim, lien, encumbrance, levy, judgment, or charge if Mortgagor is in good faith contesting the validity and has provided for payment of the entire amount of any contested tax, assessment, governmental charge, claim, lien, encumbrance, levy, judgment, or charge in a manner satisfactory to Lender.

8.     **Insurance.**

a.     Until the Obligations are fully satisfied, Mortgagor will keep the Property continuously insured against loss by fire; windstorm; and other hazards, casualties, and contingencies, including vandalism and malicious mischief, in whatever amounts and for whatever periods Lender reasonably requires. Mortgagor shall also maintain a policy or policies of rent loss insurance in an amount reasonably acceptable to Lender. Mortgagor shall pay promptly when due all premiums for this insurance and deliver to Lender, on request, receipts showing payment. All insurance shall be carried in companies approved by Lender, and the policies and renewals shall be held by and pledged to Lender (unless Lender directs or permits otherwise) as additional security and shall have attached a mortgagee clause acceptable to Lender, making all losses under the policies payable to Lender or its successors and assigns, as its or their interest may appear. In the event of loss or damage to the Property, Mortgagor shall give immediate notice in writing by mail to Lender, who may make proof of loss if not made promptly by Mortgagor.

b.     If at any time the Property is identified by the director of the Federal Emergency Management Agency or any other person or entity designated with such responsibility under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, and the National Flood Insurance Reform Act of 1994, all as amended (collectively, the Flood Act), as being in a flood hazard area, Mortgagor shall keep the Property covered by flood insurance in whatever amount Lender requires and in at least the amount required by the Flood Act and all regulations issued under it.

9.     **Eminent domain.**

a.     If the entire Property or a portion thereof is taken under the power of eminent domain, the entire award or payment in lieu of condemnation, to the full extent of the Obligations, shall be paid to Lender.

b.     Application by Lender of any condemnation award or payment or portion to the Obligations shall not excuse, extend, or reduce the regularly scheduled payments due. Lender is empowered in the name of Mortgagor to receive and give acquittance for any such award or payment, whether it is joint or several. However, Lender shall not be held responsible for failure to collect any such award or payment, regardless of the cause of the failure.

10.     **Removal of improvements.** Except for replacement, maintenance, and relocation in the ordinary course of business, Mortgagor shall not remove from the Property any improvement,

3

accessions, or fixtures pertaining to or forming a part of the Property without Lender's prior written consent. All replacements shall be with improvements or fixtures of the same or better quality than those replaced.

11. **Compliance with law.** Mortgagor will comply promptly with all laws, ordinances, regulations, and orders of all public authorities having jurisdiction over the Property relating to its use, occupancy, and maintenance and shall, on request, promptly submit to Lender evidence of the compliance. Nothing shall be deemed to prohibit Mortgagor from contesting the enforceability or applicability of any law, ordinance, regulation, or order; however, Lender, in its sole discretion, may require that Mortgagor comply with any law, ordinance, regulation, or order during the pendency of any contest or appeals. Mortgagor will not permit the Property or any portion to be used for any unlawful purpose.

12. **Environmental warranties, compliance, and indemnification.** As used herein: the term "Hazardous Substance" shall mean any substance, material, or waste that is (a) included within the definitions of "hazardous substances," "hazardous materials," "hazardous waste," "toxic substances," "toxic materials," "toxic waste", or words of similar import in any Environmental Law, (b) listed as hazardous substances by the United States Department of Transportation or by the Environmental Protection Agency, or (c) petroleum, petroleum-related, or a petroleum by-product, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable, explosive, radioactive, freon gas, radon, or a pesticide, herbicide, or any other agricultural chemical. The term "Environmental Law" shall mean any federal, state, or local law, rule, regulation, decision, policy, or guideline, pertaining to Hazardous Substances, or protection of the environment, and all present and future amendments thereto and shall include, without limitation, "Environmental Management Laws" as defined in Ind. Code § 13-11-2-71. Mortgagor represents and warrants to the Lender that (i) neither the Premises nor the Mortgagor are in violation of any Environmental Law applicable to the Premises, or are subject to any existing, pending, or threatened governmental investigation pertaining to the Premises, or are subject to any remedial obligation or lien under or in connection with any Environmental Law, and neither Mortgagor nor any tenant of the Premises has received notice of intention to hold a lien has may be imposed under Ind. Code § 13-25-4-12 et. seq. (ii) there is not the presence of nor has there been a release of Hazardous Substances in, on, or around any part of the Premises or the soil, groundwater, or soil vapor on or under the Premises, or the migration of any Hazardous Substance, from or to any other property in the vicinity of the Premises, and (iii) neither the Mortgagor's nor any tenant's intended future use of the Premises will result in the release of any Hazardous Substance in, on, or around any part of the Premises or in the soil, groundwater, or soil vapor on or under the Premises, or the migration of any Hazardous Substance from or to any other property in the vicinity of the Premises.

The Mortgagor shall neither use nor permit any third party to use, generate, manufacture, produce, store, or release, on, under, or about the Premises, or transfer to or from the Premises, any Hazardous Substance, except in compliance with all Environmental Laws, provided that if any such occurrence shall nevertheless happen, the Mortgagor shall promptly remedy such condition, at its sole expense and responsibility. The Mortgagor further shall otherwise comply or cause any tenant to comply with all Environmental Laws. The Mortgagor shall not permit any environmental liens to be placed on any portion of the Premises. The Mortgagor shall promptly notify the Lender in writing if (a) any of the representations and warranties herein are no longer accurate, (b) there may

4

be any Hazardous Substance in, on, or around the Premises or the soil, groundwater, or soil vapor on or under the Premises, or (c) any violation of any Environmental Law on or affecting or otherwise in respect of the Premises has occurred. The Lender and its agents shall have the right, and are hereby authorized, at any reasonable time to enter upon the Premises for the purposes of observing the Premises, taking and removing soil or groundwater samples, and conducting tests and/or site assessments on the Premises, or taking such other actions as the Lender deems necessary or advisable to clean up, remove, resolve, or minimize the impact of, or otherwise deal with, any Hazardous Substances on or affecting the Premises following receipt of any notice from any person or entity asserting the existence or possible existence of any Hazardous Substances pertaining to the Premises, that, if true, could jeopardize the Lender's security for the Obligations. All reasonable costs and expenses paid or incurred by the Lender in the exercise of any such rights shall be secured hereby and shall be payable by the Mortgagor upon demand.

The Mortgagor shall indemnify and hold the Lender harmless from, for and against any and all actions, causes of action, claims, liabilities, damages (including foreseeable and unforeseeable consequential damages), losses, fines, penalties, judgments, awards, settlements, and costs and expenses (including, without limitation, reasonable attorneys' fees, experts', engineers', and consultants' fees and costs and expenses of investigation, testing, remediation, and dispute resolution) (collectively referred to as "Environmental Costs") that directly or indirectly arise out of or relate in any way to: (a) Any investigation, cleanup, removal, remediation, or restoration work of site conditions of the Premises relating to Hazardous Substances; (b) Any resulting damages, harm, or injuries to the person or property of any third parties or to any natural resources involving Hazardous Substances relating to the Premises; (c) Any actual or alleged past or present disposal, generation, manufacture, presence, processing, production, release, storage, transportation, treatment, or use of any Hazardous Substance on, under, or about the Premises; (d) Any actual or alleged past or present violation of any Environmental Law relating to the Premises; (e) Any lien on any part of the Premises under any Environmental Law; or (f) Breach of any representation or warranty by or covenant of the Mortgagor herein. **The foregoing indemnity is expressly intended to include, and does include, any Environmental Costs arising as a result of any strict liability imposed or threatened to be imposed on the Lender in connection with any of the indemnified matters described in this Section or arising as a result of the negligence of the Lender in connection with such matters.** This indemnity shall continue in full force and effect and shall survive the payment and performance of the Obligations, the release of record of the lien or any foreclosure (or action in lieu thereof) of this Mortgage, the exercise by the Lender of any other remedy under this Mortgage or any other document or instrument evidencing or securing the Obligation, and any suit, proceeding, or judgment against the Mortgagor by the Lender hereon.

13.     **Assignment of rents and leases.** As additional security for the Obligations and performance of the covenants and agreements set forth in this Mortgage, Mortgagor assigns to Lender and grants Lender a security interest in any oil and gas located in, on, or under the Property; any and all Leases of the Property; and all rents, issues, income, and profits derived from the use of the Property or any portion of it, whether due or to become due. These assignments shall run with the land and shall be good and valid against Mortgagor and all persons claiming by, under, or through Mortgagor from the date of recording of this Mortgage and shall continue to be operative during foreclosure or any other proceedings taken to enforce this Mortgage. If any foreclosure sale

5

results in a deficiency, the assignments shall continue as security during the foreclosure redemption period.

Mortgagor also covenants with and warrant to Lender that, as of the date of this Mortgage and for so long as any of the Obligations remains unpaid or unperformed:

      a.      Mortgagor shall promptly inform Lender of, assign, and deliver any Lease of the Property or any part and shall make, execute, and deliver to Lender, on demand, any documents, agreements, and instruments that, in Lender's opinion, may be necessary to protect Lender's rights under this Mortgage. Mortgagor's failure to do so will not impair Lender's interest in or rights with respect to any subsequent lease nor in any way affect the applicability of this Mortgage to the lease and the unpaid rents due or to become due.

      b.      Mortgagor shall not, without the prior written consent of Lender, (i) cancel or accept surrender of a Lease; (ii) modify or alter a lease in any way, either orally or in writing; (iii) reduce the amount of or postpone payment of any Lease rents; (iv) consent to any assignment of the lessee's interest in a lease or to any subletting; (v) collect or accept payment of rents under a Lease for more than one month in advance; or (vi) make any other assignment, pledge, encumbrance, or other disposition of a Lease or any Lease rents, issues, income, or profits.

Any of the above acts, if done without Lender's prior written consent, shall be null and void; and Mortgagor shall perform and discharge every obligation, covenant, and agreement required to be performed by the landlord under any lease and, if Mortgagor fails to do so, Lender, at Lender's sole option and without releasing Mortgagor from any the obligation, may perform or discharge them in the manner and to the extent Lender deems necessary to protect its rights and interests under this Mortgage. All costs, expenses, and sums paid by Lender in performing under any Lease, including reasonable attorney fees, shall be added to the Obligations secured by this Mortgage. This assignment of rents is given as collateral security only and will not be construed as obligating Lender to perform any of the covenants or undertakings required to be performed by Mortgagor under any Lease.

      14.      **Assignment of contracts and agreements.** Mortgagor assigns to Lender, as further security for the Obligations, Mortgagor's interest in all agreements, contracts (including contracts for the lease or sale of the Property or any portion), licenses, and permits affecting the Property. The assignment shall not be construed as a consent by Lender to any agreement, contract, license, or permit so assigned or to impose on Lender any obligations. Mortgagor shall not cancel or amend any of the agreements, contracts, licenses, or permits assigned by this section or permit any of them to terminate if they are necessary or desirable for the operation of the Property, except in the ordinary course of business, without first obtaining, on each occasion, Lender's written approval, such approval not to be unreasonably withheld, conditioned or delayed. This section shall not apply to any agreement, contract, license, or permit that terminates if it is assigned without the consent of any party other than Mortgagor or the issuer, unless the consent has been obtained or this assignment is ratified by the party or issuer; nor shall this section be construed as a present assignment of any agreement, contract, license, or permit that Mortgagor is required by law to hold to operate the Property for the purposes intended. Notwithstanding the forgoing to the contrary, Lender shall not be deemed to have assumed any obligation or liability under any such agreements,

6

contracts, licenses, and permits, unless Lender consents, in its sole and absolute discretion, to the assumption of such obligation or liability.

15. **Due on sale.** Lender, in making the loan secured by this Mortgage, is relying on the integrity of Mortgagor and its undertaking to maintain the Property. If Mortgagor should sell, transfer, convey or assign the Property or any right, title or interest in it, whether legal or equitable; voluntarily or involuntarily; by outright sale, deed, installment sale contract, land contract, contract for deed, or otherwise, then the Lender shall have the right at its sole option to declare all sums secured and then unpaid to be immediately due and payable even if the period for the payment has not then have expired, anything in this Mortgage or the Letter Agreement to the contrary notwithstanding, and to exercise all of its rights and remedies under this Mortgage. No sale of the Property and no forbearance or extensions by Lender of the time for payment of the Obligations or the performance of the covenants and agreements shall in any way operate to release, discharge, modify, change, or affect the lien of this Mortgage or the liability of Mortgagor or Borrower, if any, on the Obligations or for the performance, either in whole or in part.

16. **Secondary Financing.** Mortgagor will not, without the prior written consent of Lender, mortgage or pledge the Property as security for any other loan or obligation of Mortgagor; provided, however, that Lender's consent shall not be required to any modification or amendment of any prior mortgage existing on the Effective Date.

17. **Waste; Abandonment.** The Mortgagor shall not abandon the Property, commit or permit waste on the Property, or do any other act causing the Property to become less valuable. The Mortgagor will keep the Property in good order and repair and in compliance in all material respects with any law, regulation, ordinance, or contract affecting the Property and, from time to time, will make all needful and proper replacements so that all fixtures and improvements will at all times be in good condition, fit and proper for their respective purposes. The Mortgagor shall use and maintain the Property in conformance with all applicable laws, ordinances, and regulations. The Lender or its authorized agent shall have the right to enter upon and inspect the Property at all reasonable times.

18. **Remedies on default.** In the event any Obligation are outstanding following the maturity date of the Loan (as set forth in the Letter Agreement), or any default in the performance of any of the covenants, conditions, and agreements in this Mortgage and the continuance of such default for fifteen (15) days after receipt of written notice from Lender specifying such default, (each an "Event of Default"), Lender may, in addition to and not in lieu of or substitution for all other rights and remedies provided by law, take the following actions:

a. **Accelerate obligations.** Lender may, without notice, except as expressly required by law, declare the entire unpaid and outstanding principal balance of the Obligations, and all accrued interest, to be immediately due and payable in full and, at Lender's option, may bring suit for it and take any steps and institute any other proceedings that Lender deems necessary to enforce the Obligations and to protect the lien of this Mortgage.

b. **Mortgage Foreclosure**

i. Upon an Event of Default (after any applicable notice and cure period), Lender shall have the right to foreclose this Mortgage under the provisions of Indiana Code § 32-29-

7

7-3 et seq., and Mortgagor agrees to pay all of Lender's costs and expenses, including reasonable attorney fees, which shall be added to the Obligations secured by this Mortgage. At any foreclosure sale held under these Indiana statutes, Mortgagor agrees that in its foreclosure sale bid price, Lender may deduct from the appraised value of the Property (A) a brokerage commission of not more than 10 percent of the Property value, (B) the unpaid balance of any mortgage or other liens that have priority over the lien of this Mortgage, and (C) the sum of all unpaid property taxes and assessments and insurance premiums due and to become due on the Property through the date when the foreclosure redemption period shall expire. Any foreclosure sale may, at the sole option of Lender, be made en masse or in parcels, any law to the contrary notwithstanding; and Mortgagor knowingly, voluntarily, and intelligently waives any right to require any foreclosure sale to be made in parcels or any right to select which parcels shall be sold. The proceeds of any foreclosure sale shall be applied, as Lender elects, to the payment of Lender's collection and other expenses, including reasonable attorney fees, and to the payment of the Obligations, with the surplus, if any, to Mortgagor or Mortgagor's successor in interest. Commencement of proceedings to foreclose this Mortgage in any manner authorized by law shall be deemed an exercise of Lender's option to accelerate the Obligations. After the date on which the maturity of the Obligations secured by this Mortgage has been accelerated, Lender acceptance of any amounts paid by Mortgagor less than the full unpaid principal balance of the Obligations plus accrued interest, late charges, and Lender's costs and expenses as described in this Mortgage shall not waive the default or acceleration but shall only be credited on the unpaid balance of the Obligations unless Lender specifically agrees in writing to waive any default or acceleration.

c.   **Collection of Rents**

i.   Upon the occurrence of an Event of Default, Lender shall have the right to enter into peaceful possession of the Property and to collect and receive all rents, issues, income, and profits from the Property; to terminate any tenancy; to maintain proceedings to recover rents or possession of any of the Property from any tenant or trespasser; to rent or lease the Property or any portion of it on such terms as Lender deems best; and to have all oil and gas royalties and any other income from the Property. Lender, in whatever order Lender in its sole discretion elects, may apply the proceeds of any rents, issues, profits, and income to (A) preservation, maintenance, or operation of the Property; (B) payment of taxes due on the Property; and (C) payment of the Obligations. Mortgagor irrevocably consents and agrees that the lessees under any Lease, on demand and notice from Lender of Mortgagor's Event of Default, shall be required to pay all rents, issues, profits, and income to Lender, without any obligation on the lessees to determine the actual existence of any default by Mortgagor. Upon the occurrence of an Event of Default, Lender may enter on the Property, by its officers, agents, or employees, to collect rents, issues and profits and to operate and maintain the Property; and upon the occurrence of an Event of Default, Mortgagor authorizes Lender in general to perform all acts necessary to operate and maintain the Property in the same manner and to the same extent that Mortgagor might. The entry and taking possession of the Property or any part of it by Lender may be made by actual entry and possession or by written notice served personally on or sent by certified mail to the last owner of the Property appearing in Lender's records, as the Lender elects, without further authorization or notice.

ii.   In connection with Lender's right to possession of the Property on the occurrence of an Event of Default, as specified in the subsection above, Mortgagor acknowledges

8

that it has been advised that there is a significant body of caselaw in Indiana that purportedly provides that in the absence of a showing of waste of a character sufficient to endanger the value of the Property or other special factors, a mortgagor is entitled to remain in possession of the Property and to enjoy the income, rents, and profits during the pendency of foreclosure proceedings and until the redemption period expires, even if the mortgage documents expressly provide to the contrary. Mortgagor further acknowledges that it has been advised that Lender recognizes that the value of the security covered by this Mortgage is inextricably intertwined with the effectiveness of the management, maintenance, and general operation of the Property and that Lender would not make the loan secured by this Mortgage unless it could be assured that it would have the right to take possession of the Property to manage it or to control its management and to enjoy the income, rents, and profits immediately on the occurrence of an Event of Default under this Mortgage, notwithstanding that foreclosure proceedings may not have been instituted or may be pending or that the redemption period may not have expired. Accordingly, Mortgagor knowingly, intelligently, and voluntarily waives all right to possession of the Property from and after the occurrence of an Event of Default on demand for possession by Lender, and Mortgagor agrees not to assert any objection or defense to Lender's request or petition to a court for possession. The rights conferred on the Lender by this Mortgage have been agreed on before the occurrence of an Event of Default under this Mortgage, and the exercise by Lender of any such rights shall not be deemed to put Lender in the status of a mortgagee in possession. Mortgagor acknowledges that this provision is material to this transaction and that Lender would not make the loan secured by this Mortgage but for this section.

     d.    **Title reports.** Lender may procure mortgage foreclosure or title reports. Mortgagor covenants to pay to Lender all sums paid for such purposes with interest at the highest rate applicable to the Obligations, and the sums and the interest shall constitute a further lien on the Property.

     e.    **Appraisals and audits.** Lender may procure appraisals, environmental audits, and other investigations or analyses of the Property as Lender determines are required by regulatory or accounting rules, procedures, or practices or are otherwise be prudent or necessary. Mortgagor shall grant Lender free and unrestricted access to the Property for such purposes. Mortgagor covenants to pay immediately to Lender all sums paid for such purposes with interest at the highest rate applicable to the Obligations, and the sums and the interest shall constitute a further lien on the Property.

     19.    **Costs of legal proceedings.** Mortgagor shall pay Lender a reasonable attorney fee in addition to all other legal costs if Lender becomes a party, either as plaintiff or defendant, to any legal proceedings in relation to the Property or the lien created by this Mortgage; and those sums shall be secured by this Mortgage and be payable at the highest rate applicable to the Obligations.

     20.    **Books and records.** Mortgagor covenants and agrees to furnish to Lender promptly certificates of occupancy and whatever other books, records, documents, information, and statements pertaining to Mortgagor, the Property, its operations, and any guarantors that Lender requests. All books, records, and other information provided by Mortgagor shall be in a form that is acceptable to Lender, and all costs of providing them shall be borne entirely by Mortgagor.

9

21.      **Security agreement and financing statements.** Mortgagor shall execute, acknowledge and deliver any further conveyances, documents, mortgages, and assurances that Lender reasonably requires for accomplishing the purposes of this Mortgage. On any failure of Mortgagor to do so, Lender may execute, record, file, rerecord and refile any documents for and in the name of Mortgagor, and Mortgagor irrevocably appoints Lender as agent and attorney-in-fact of Mortgagor for those purposes. This document is intended by the parties to be, and shall be construed as, a security agreement, as that term is defined and used in the Indiana Uniform Commercial Code, as amended, and shall grant to Lender a security interest in Mortgagor's fixtures. For purposes of the Indiana Uniform Commercial Code, (a) Mortgagor is the *debtor,* (b) Lender is the *secured party,* (c) information concerning the security interest created by this Mortgage may be obtained from Lender at its address set forth on page 1, and (d) Mortgagor's mailing address is that set forth on page 1.

22.      **Nonlender Liens; insolvency proceedings.** If any nonlender mortgage foreclosure proceeding or any federal, state, or local tax lien, seizure, levy, forfeiture, or any other lien proceeding is instituted, recorded, or filed against the Property that is not discontinued, reserved for in cash in an amount and manner satisfactory to Lender, or bonded by a company satisfactory to Lender within 30 days after initiation, recording, or filing; if any insolvency or receivership proceedings, either voluntary or involuntary, are instituted by or against Mortgagor for the liquidation or rehabilitation of Mortgagor's assets and affairs; or if any criminal proceedings are initiated in which forfeiture of the Property is a potential penalty, Lender may, at its option and without notice, declare the entire Obligations to be immediately due and payable and may institute whatever proceedings, including foreclosure of this Mortgage, Lender deems necessary to protect its interest in the Property.

23.      **Prior mortgage.** Lender may, at Lender's sole option but without obligation to do so, cure any default by Mortgagor in any indebtedness or other agreement secured by any prior mortgage as Lender deems necessary to protect Lender's mortgage lien, assignments, and security interests under this Mortgage; and all moneys advanced by Lender and all costs incurred in effecting any such cure, including reasonable attorney fees, shall be added to the Obligations secured by this Mortgage. Mortgagor shall not be required to make monthly payments under this Mortgage for the payment of taxes, assessments, and insurance premiums if the prior mortgage requires the payment and the prior mortgagee maintains a reserve fund that, in Lender's opinion, is adequate for the payment of all taxes, assessments, and insurance premiums due and to become due on the Property. Mortgagor consents and agrees that Lender may contact any prior mortgagee or other lienor at any time to obtain the payment status, unpaid balance, copies of any documents, and agreements pertaining to Mortgagor or the Property and any other information Lender deems advisable.

24.      **Suretyship waivers.**

a.      This Mortgage secures an obligation of payment and not of collection, and Mortgagor agrees that Lender's recourse on this Mortgage shall be immediate at any time after the Obligations or any part of them have not been paid when due (whether by acceleration or otherwise) or after Mortgagor has defaulted or otherwise failed to perform when due any of its obligations, covenants, representations, or warranties to Lender (after any applicable notice and cure period). Lender's rights under this Mortgage shall not be contingent on the exercise or enforcement by

10

Lender of whatever remedies it may have against Mortgagor or others or on the enforcement of any other lien or realization on any other security or collateral Lender may at any time possess. Any one or more successive or concurrent actions may be brought against Mortgagor either in the same action, if any, brought against Mortgagor or in separate actions, as often as Lender, in its sole discretion, deems advisable. No election to proceed in one form of action or proceeding, against any party, or on any obligation shall constitute a waiver of Lender's right to proceed in any other form of action or proceeding or against other parties unless Lender has expressly waived the right in writing. Specifically, but without limiting the generality of the above, no action or proceeding by Lender against Mortgagor under any document or instrument evidencing or securing the Obligations shall serve to diminish the rights of Lender under this Mortgage, except to the extent that Lender realizes payment by the action or proceeding.

b.     The obligations of Mortgagor under this Mortgage shall in no way be affected or impaired by:

i.     any amendment, alteration, extension, renewal, waiver, indulgence, or other modification of the Obligations;

ii.     any settlement or compromise in connection with the Obligations;

iii.     any subordination of payments under the Obligations to any other debt or claim;

iv.     any substitution, exchange, release, or other disposition of all or any part of any collateral for the Obligations;

v.     any failure, delay, neglect, act, or omission by Lender to act in connection with the Obligations;

vi.     any advances for the purpose of performing any covenant or agreement of Mortgagor or curing any breach;

vii.     the filing by or against Mortgagor of bankruptcy, insolvency, reorganization, or other debtor's relief afforded Mortgagor pursuant to the present or future provisions of the Bankruptcy Code or any other state or federal statute or by the decision of any court; or

viii.     any other matter whether similar or dissimilar to the above.

The obligations of Mortgagor are unconditional, notwithstanding any defect in the genuineness, validity, regularity, or enforceability of the Obligations or any other circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety, Borrower or Mortgagor.

c.     Mortgagor waives every defense that, under principles of suretyship law or otherwise, would otherwise operate to impair or diminish the Mortgagor's liability or Lender's rights under this Mortgage, including, without limitation,

11

        i.     notice of acceptance of this Mortgage and of creations of Obligations to Lender;

        ii.    any subrogation to Lender's rights against Mortgagor or Borrower until the Obligations have been paid in full;

        iii.   presentment and demand for payment of any Obligations;

        iv.   protest, notice of protest, and notice of dishonor or default to Mortgagor or Borrower or to any other party with respect to any of the Obligations;

        v.    all other notices to which Mortgagor or Borrower might otherwise be entitled;

        vi.   any demand for payment under this Mortgage;

        vii.   any defense arising by reason of any disability or other defense of Mortgagor or Borrower by reason of the cessation from any cause whatsoever of the liability of Mortgagor or Borrower;

        viii.   any rights to extension, composition, or otherwise under the Bankruptcy Code or any amendments or under any state or other federal statute; and

        ix.    any right or claim or claim of right to cause a marshalling of Mortgagor's or Borrower's assets.

No notice to or demand on Mortgagor shall be deemed to be a waiver of Mortgagor's or Borrower's obligations or of Lender's right to take further action without notice or demand.

    25.   **Binding effect.** Until this Mortgage is discharged in full, all of the covenants and conditions shall run with the land, shall be binding on the successors and assigns of Mortgagor and Borrower, and shall inure to the benefit of the successors and assigns of Lender. Any reference to "Mortgagor," "Borrower" or "Lender" shall include their respective successors and assigns.

    26.   **Notices.** All notices, demands, and requests required or permitted to be given to Mortgagor or by law shall be deemed delivered when deposited in the U.S. mail, with full postage prepaid, addressed to Mortgagor at the last address of Mortgagor on the records of Lender.

    27.   **No waiver.** No waiver by Lender of any right or remedy granted shall affect or extend to any other right or remedy of Lender or affect the subsequent exercise of the same right or remedy by Lender for any further or subsequent Event of Default; and all such rights and remedies of Lender are cumulative. Time is of the essence.

    28.   **Severability.** If any provision of this Mortgage conflicts with any statute or rule of law of the State of Indiana or is otherwise unenforceable for any reason, it shall be deemed null and void to the extent of the conflict or unenforceability but shall be deemed separable from and shall not invalidate any other provisions of this Mortgage.

12

This Mortgage was signed and delivered by Mortgagor on the Effective Date stated in the first paragraph.

MORTGAGOR:

CJ AUTOMOTIVE INDIANA, LLC, an Indiana limited liability company,

By: _R. Bomya_

Name: _RAYMOND BOMYA_

Title: _PRESIDENT ; CEO_

STATE OF _Michigan_ )
_Wayne_ COUNTY )

Acknowledged before me in _Wayne_ County, _Michigan_, on July _23_, 2020, by _Raymond Bomya_, the _President + CEO_ of CJ AUTOMOTIVE INDIANA, LLC, an Indiana limited liability company, on behalf of the company.

_Rachel Bomya_

Print: _Rachel Bomya_

Notary Public, State of Michigan, County of _Wayne_.

My commission expires: _11/17/ 2024_.

If acting in a county other than county of commission: Acting in the County of _____.

RACHEL MARIE BOMYA
NOTARY PUBLIC-STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires November 17, 2024
Acting in the County of _Wayne_

43833443 v2

WITNESS:

By: _Darlene Donya_
　　　Witness
Printed: Darlene Donya

STATE OF _Michigan_

COUNTY OF _Wayne_

I, _Rachel Marie Bomya_, a Notary Public of _Wayne_ County, State of _Michigan_, certify that _Darlene Brown_ personally appeared before me this day and executed the foregoing.

Witness my hand and official seal, this _23_ day of _July_, 2020.

Notary Public: _Rachel Marie Bomya_
Printed Name: _Rachel Marie Bomya_
My Commission Expires: _9/17/2024_

[Affix Notarial Stamp or Seal]

RACHEL MARIE BOMYA
NOTARY PUBLIC-STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires September 17, 2024
Acting in the County of Wayne

Drafted by and when recorded return to:

Burr & Forman LLP
420 North 20th Street, Suite 3400
Birmingham, AL 35203, Attn: Derek F. Meek

*I affirm, under the penalties for perjury, that I have taken reasonable care to redact each Social Security Number in this document, unless required by law. ~Derek F. Meek, Attorney at Law*

15

EXHIBIT A

That certain property located in DeKalb County, Indiana as more particularly described as follows:

Parcel 1:

A part of the Northwest Quarter of Section (11), Township 34 North, Range 14 East, in said County and State, bounded by a line commencing at a point 437 feet West of the Northeast corner of the East Half of the Northwest Quarter of Section 11, as aforesaid, and running from thence South 1,055 feet to the North Boundary line of the right of way of the Lake Shore and Michigan Southern Railway Company (now the New York Central Railroad Company); thence in a Westerly direction, along the North boundary line of said tract, 459.06 feet; thence North on a line parallel with the East Boundary line of said tract, 1037.02 feet to the North Boundary line of said Northwest Quarter as aforesaid; thence East along the North boundary line of said Northwest Quarter 459.06 feet to the place of beginning.

Parcel 2:

Lot Numbered Nine (9) in G. T. John's Addition to the Town, now City of Butler, DeKalb County, Indiana.

Parcel 3:

Commencing at a point on the North line of Section Eleven (11), Township 34 North, Range 14 East and on the center line of U.S. Highway #6, this point being 1,413 feet East of the Northwest corner of said Section 11; thence South 00 degrees 30 minutes West 1,023.9 feet; thence South 87 degrees 30 minutes East 331.8 feet, thence North 1037.02 feet to a point on the North line of said Section 11, and the center line of U.S. #6; thence West 308 feet to the place of beginning.

[PARCEL IDS 23-07-11-126-002; 23-07-11-126-003; 23-07-11-127-009]

# EXHIBIT H

**CJ AUTOMOTIVE INDIANA, LLC**
100 Commerce Street
Butler, Indiana 46721

August 18, 2021

*Via email* *jfine@vantageeh.com*
*And Regular Mail*
Butler Propco LLC
c/o Vantage Holdings Group LLC
Attention: Jonathan Fine
200 Park Avenue, Suite 1700
New York, NY 10166

     Re:   Notice of Termination

Dear Jonathan:

     Pursuant to Section 5.2 of the Contract of Purchase and Sale, as amended, Vantage's failure to timely deliver to CJ Automotive Indiana, LLC ("CJ") written notice of termination during the Inspection Period constitutes termination of the Contract effective immediately. CJ does not intend on making any claims against the Earnest Money Deposit, so CJ has no objection in title releasing the same. Thank you.

     Very truly yours,

     CJ AUTOMOTIVE INDIANA, LLC

     Raymond Bomya

cc:
*Via email* *hgoldman@plunkettcooney.com*
*And Regular Mail*
Plunkett Cooney PC
Attention: Howard Goldman
38505 Woodward, Suite 100
Bloomfield Hills, MI 48304

*Via email* *bobpowell@amrock.com*
*And Regular Mail*
Amrock LLC
Attention: Bob Powell
201 West Big Beaver Road, Suite 160
Troy, MI 48084-4169